**Clinton COLE, Appellant,**

v.

**BURNS INTERNATIONAL SECURITY SERVICES, et al., Appellees.**

**No. 96–7042.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1996.

Decided Feb. 11, 1997.

David A. Branch argued the cause and filed the briefs, Avon Lake, OH, for appellant.

Harold P. Coxson, Jr. argued the cause and filed the brief, Washington, DC, for appellees. Francis T. Coleman, Jr. entered an appearance.

Before: EDWARDS, Chief Judge, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

HARRY T. EDWARDS, Chief Judge:

TABLE OF CONTENTS

I. SUMMARY OF OPINION

II. BACKGROUND

III. DISCUSSION

A. THE SCOPE OF SECTION 1 OF THE FAA

B. THE ENFORCEABILITY OF CONDITIONS OF EMPLOYMENT REQUIRING INDIVIDUAL EMPLOYEES TO ARBITRATE CLAIMS RESTING ON STATUTORY RIGHTS

   1. THE ROLE OF ARBITRATION: COLLECTIVE BARGAINING AND STATUTORY CLAIMS DISTINGUISHED

   2. THE VALIDITY OF THE AGREEMENT TO ARBITRATE IN THIS CASE

   3. THE OBLIGATION TO PAY ARBITRATORS' FEES

   4. JUDICIAL REVIEW

IV. CONCLUSION

### I. SUMMARY OF OPINION

This case raises important issues regarding whether and to what extent a person can be required, *as a condition of employment,* to (1) waive all rights to a trial by jury in a court of competent jurisdiction with respect to any dispute relating to recruitment, employment, or termination, including claims involving laws against discrimination, and (2) sign an agreement providing that, at the employer's option, any such employment disputes must be arbitrated. At its core, this appeal challenges the enforceability of conditions of employment requiring individuals to arbitrate claims resting on statutory rights. The issues at hand bring into focus the seminal decision of *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and call into question the limits of the Supreme Court's holdings in that case.

In this case, the appellant, Clinton Cole, seeks to overturn an order of the District Court dismissing his complaint under Title VII of the Civil Rights Act of 1964, as amended, and compelling arbitration of his disputes with Burns International Security Services ("Burns" or "Burns Security"). Although Cole seemingly raised a viable action under Title VII, the District Court held that his statutory claims of employment discrimination should be dismissed pursuant to the Federal Arbitration Act ("FAA" or "Act"). The District Court held that section 1 of the Act does not exempt *all* "employment" contracts and that Cole's job was not in an exempt category, and, therefore, Cole was bound by the agreement he had signed with Burns allowing the employer to opt for arbitration. In reaching this conclusion, the trial court found that the arbitration agreement was a valid and enforceable contract.

We agree with the District Court that section 1 of the FAA does not exclude all contracts of employment from the coverage of the FAA. Every circuit court to squarely address this issue has held that section 1 excludes from the coverage of the FAA only the employment contracts of workers actually engaged in the movement of goods in interstate commerce. Additionally, the Supreme Court's interpretation of section 2 of the FAA in *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), strongly supports this narrow interpretation of section 1. Finally, although the Supreme Court did not address the issue of section 1's scope in *Gilmer,* the majority's decision suggests that the Court would be inclined to accept the narrow interpretation we adopt.

Second, we find that the disputed arbitration agreement is valid. In doing so, we are mindful of the clear distinctions between arbitration of labor disputes under a collective bargaining agreement and mandatory arbitration of individual statutory claims outside of the context of collective bargaining. We are also cognizant of the numerous concerns that have been voiced by arbitrators, legal commentators, the Equal Employment Opportunity Commission ("EEOC"), and National Labor Relations Board ("NLRB") regarding the potential inequities and inadequacies of arbitration in individual employment cases, as well as their concerns about the competence of arbitrators and the arbitral forum to enforce effectively the myriad of public laws protecting workers and regulating the workplace. Nonetheless, in this case, we are

constrained by *Gilmer* to find the arbitration agreement enforceable. We do not read *Gilmer* as mandating the enforcement of *all* mandatory agreements to arbitrate statutory claims; rather, we read *Gilmer* as requiring the enforcement of arbitration agreements that do not undermine the relevant statutory scheme. The agreement in this case meets that standard.

We note that this case raises an issue not directly presented in *Gilmer* or any other Supreme Court case to date: can an employer require an employee to arbitrate all disputes and also require the employee to pay all or part of the arbitrators' fees? We hold that it cannot. In *Gilmer* and other securities industry cases, the employers routinely paid *all* arbitrators' fees, so the matter was not in dispute. However, there is no reason to think that the Court would have approved a program of mandatory arbitration of statutory claims in *Gilmer* in the absence of employer agreement to pay arbitrators' fees. Because public law confers both substantive rights and a reasonable right of access to a neutral forum in which those rights can be vindicated, we find that employees cannot be *required* to pay for the services of a "judge" in order to pursue their statutory rights. In this case, the parties' contract does not address explicitly the payment of the arbitrators' fees; however, because ambiguity in a contract should be resolved against the drafter—here, the employer—and ambiguity should be resolved in favor of a legal construction of the parties' agreement, we interpret the arbitration agreement at issue as requiring Burns to pay all arbitrators' fees associated with the resolution of Cole's claims.[1] So construed, the contract is valid.

The dissent objects to our reaching the question as to who bears the burden of paying for an arbitrator's services, presumably because in *some* cases an employee might not be required to pay the arbitrator's compensation. This argument clearly misses the point. In our view, an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims under Title VII (any more than an employee can be made to pay a judge's salary). If there is any risk that an arbitration agreement can be construed to require this result, this would surely deter the bringing of arbitration[2] and constitute a *de facto* forfeiture of the employee's statutory rights. The only way that an arbitration agreement of the sort at issue here can be lawful is if the employer assumes responsibility for the payment of the arbitrator's compensation.

Cole has also argued that the arbitration agreement should not be enforced because the arbitrator's rulings, even as to the meaning of public law under Title VII, will not be subject to judicial review. Cole is wrong on this point. The nearly unlimited deference paid to arbitration awards in the context of collective bargaining is not required, and not appropriate, in the context of employees'

---

1. As we note *infra*, at the beginning of part B, this is *not* a case in which an employee and an employer, in the face of a legal problem, have made an *ad hoc*, mutually voluntary decision to pursue arbitration or some other form of alternative dispute resolution in lieu of formal litigation. Here the contract is interpreted to require Burns to pay the arbitrator's fees and expenses because only the employer can elect arbitration, and, if it does, Cole must comply. We do not mean to suggest, however, that our decision would be different if the agreement at issue allowed *either* party to require arbitration. The point here is that Cole has been forced, by a condition of employment, to give up his right to pursue his statutory claims in court.

2. In *Synar v. United States*, 626 F.Supp. 1374, 1392 (D.D.C.1986) (per curiam) (Scalia, Circuit Judge, Johnson, District Judge, Gasch, Senior District Judge), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714, 730, 106 S.Ct. 3181, 3189–90, 92 L.Ed.2d 583 (1986), the court considered whether Congress's ability to remove the Comptroller General of the Congressional Budget Office by joint resolution rendered the Gramm–Rudman–Hollings Act unconstitutional under the separation of powers doctrine. In doing so, it rejected the claim that it need not decide this issue until an attempt was actually made to remove the Comptroller. The court found that the mere possibility of removal had immediate implications for the Comptroller's independence and necessitated the resolution of the separation of powers issue. "[T]he Comptroller General's presumed desire to avoid removal by pleasing Congress ... create[d] the here-and-now" issue. *Id.* Similarly, in this case, the mere possibility that an employee might be required to pay all or part of the arbitrator's fees would have an immediate impact on the employee's willingness to pursue his or her statutory claims in arbitration.

statutory claims. In this context, the Supreme Court has assumed that arbitration awards are subject to judicial review sufficiently rigorous to ensure compliance with statutory law. Indeed, Burns has conceded such review in this case. Because the courts will always remain available to ensure that arbitrators properly interpret the dictates of public law, an agreement to arbitrate statutory claims of discrimination is not unconscionable or otherwise unenforceable.

## II. BACKGROUND

Clinton Cole used to work as a security guard at Union Station in Washington, D.C. for a company called LaSalle and Partners ("LaSalle"). In 1991, Burns Security took over LaSalle's contract to provide security at Union Station and required all LaSalle employees to sign a "Pre–Dispute Resolution Agreement" in order to obtain employment with Burns. The Pre–Dispute Resolution Agreement ("agreement" or "contract"), in relevant part, provides:

> In consideration of the Company employing you, you and the Company each agrees that, in the event either party (or its representatives, successors or assigns) brings an action in a court of competent jurisdiction relating to your recruitment, employment with, or termination of employment from the Company, the plaintiff in such action agrees to waive his, her or its right to a trial by jury, and further agrees that no demand, request or motion will be made for trial by jury.

> In consideration of the Company employing you, you further agree that, in the event that you seek relief in a court of competent jurisdiction for a dispute covered by this Agreement, the Company

may, at any time within 60 days of the service of your complaint upon the Company, at its option, require all or part of the dispute to be arbitrated by one arbitrator in accordance with the rules of the American Arbitration Association. You agree that the option to arbitrate any dispute is governed by the Federal Arbitration Act, and fully enforceable. You understand and agree that, if the Company exercises its option, any dispute arbitrated will be heard solely by the arbitrator, and not by a court.

This pre-dispute resolution agreement will cover all matters directly or indirectly related to your recruitment, employment or termination of employment by the Company; including, but not limited to, claims involving laws against discrimination whether brought under federal and/or state law, and/or claims involving co-employees but excluding Worker's Compensation Claims.

The right to a trial, and to a trial by jury, is of value.

YOU MAY WISH TO CONSULT AN ATTORNEY PRIOR TO SIGNING THIS AGREEMENT. IF SO, TAKE A COPY OF THIS FORM WITH YOU. HOWEVER, YOU WILL NOT BE OFFERED EMPLOYMENT UNTIL THIS FORM IS SIGNED AND RETURNED BY YOU.

Deferred Appendix ("D.A.") 12. On August 5, 1991, Cole signed the agreement and began working for Burns.[3]

In October 1993, Burns Security fired Cole. After filing charges with the Equal Employment Opportunity Commission, Cole filed the instant complaint in the United States District Court for the District of Columbia, alleging racial discrimination, harassment based on race, retaliation for his writing a letter of complaint regarding sexual

---

**3.** As noted in part III.B.2 *infra,* the parties concur that, at a minimum, the arbitration agreement means the following:

(1) The agreement allows the employer the option of forcing statutory claims into arbitration for the resolution of public law issues;

(2) The agreement's waiver of a jury trial is absolute, *i.e.* it operates even if the employer does not seek arbitration;

(3) The agreement does not affect an employee's ability to seek relief from the Equal Employment Opportunity Commission;

(4) The arbitrator is fully bound to apply Title VII and other applicable public law, both as to substance and remedy, in accordance with statutory requirements and prevailing judicial interpretation; and

(5) The agreement provides for appointment of a neutral arbitrator through the American Arbitration Association ("AAA"), and for the conduct of the arbitration proceeding in accordance with AAA rules.

harassment of a subordinate employee by another supervisor at Burns, and intentional infliction of emotional distress. Burns moved to compel arbitration of the dispute and to dismiss Cole's complaint pursuant to the terms of the contract.

The District Court found that the arbitration agreement clearly covered Cole's claims. The court also rejected Cole's suggestions (1) that the Pre–Dispute Resolution Agreement was excluded from coverage under the Federal Arbitration Act under 9 U.S.C. § 1, and (2) that the agreement was an unenforceable and unconscionable contract of adhesion. As a result, the trial court granted Burns Security's motion to compel arbitration and dismissed Cole's complaint. *Cole v. Burns Int'l Security Serv.*, No. 95–1785 (D.D.C. Jan. 31, 1996), *reprinted in* D.A. 4–11.

## III. DISCUSSION

### A. *The Scope of Section 1 of the FAA*

The Federal Arbitration Act was originally enacted in 1925 and then reenacted and codified in 1947 as Title 9 of the United States Code. Its purpose "was to reverse the long-standing judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer*, 500 U.S. at 24, 111 S.Ct. at 1651. To that end, section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1994). Section 1 of the FAA, however, states that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 (1994). Cole argues that section 1 exempts all contracts of employment that facilitate or affect commerce (even tangentially) from the provisions of section 2 and, therefore, that the Pre–Dispute Resolution Agreement (which the parties agree is part of Cole's contract for employment) is not valid and enforceable under the FAA. Burns Security argues, and the District Court found, that section 1 only

exempts employment contracts of workers actually engaged in the transportation of goods in commerce. The parties agree that Cole, as a security guard, does not fall within that narrow class of workers.

This issue was raised, but not decided, in *Gilmer*. In that case, Gilmer had been required by his employer to register as a securities representative with the New York Stock Exchange ("NYSE"). The registration application contained an agreement to arbitrate any controversy arising out of Gilmer's employment or termination of employment. When Gilmer, age 62, was terminated, he brought suit in federal court alleging a violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), and his employer sought to compel arbitration. *See id.* at 23–24, 111 S.Ct. at 1650–51. The Supreme Court acknowledged, but declined to resolve, the issue of the scope of section 1's exclusion of contracts of employment, finding that the arbitration agreement at issue was not part of a contract for employment. *Id.* at 25 n. 2, 111 S.Ct. at 1651 n. 2.

■ We hold that section 1 of the FAA does not exclude all contracts of employment that affect commerce. The rationale for the narrow reading of § 1 is straightforward and is based on two well-established canons of statutory construction. One of the canons holds that courts should "avoid a reading [of statutory language] which renders some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, ——, 115 S.Ct. 1061, 1069, 131 L.Ed.2d 1 (1995) (citing *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955)). Here, if the final phrase of the exclusionary clause—"any other class of workers engaged in foreign or interstate commerce"—extended to all workers whose jobs have any effect on commerce, the specific inclusion of seamen and railroad workers would have been unnecessary. *See Rojas v. TK Communications, Inc.*, 87 F.3d 745, 748 (5th Cir.1996) (" '[i]t is quite impossible to apply a broad meaning to the term "commerce" in Section 1 and not rob the rest of the exclusion clause of all significance.' " (quoting *Albert v. National Cash Register Co.*, 874 F.Supp. 1324, 1327 (S.D.Fla.1994))). A broad exclusion of all

employment contracts could simply have said "nothing herein shall apply to contracts of employment."

The second applicable canon, the rule of *ejusdem generis,* "limits general terms which follow specific ones to matters similar to those specified." *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936); *accord Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895– 96, 64 L.Ed.2d 525 (1980). In this case, the general phrase, "any other class of workers engaged in foreign or interstate commerce," takes its meaning from the specific terms preceding it, "seamen" and "railroad employees," and, therefore,

> under the rule of ejusdem generis, [it] include[s] only those other classes of workers who are likewise engaged directly in commerce, that is, only those other classes of workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it.

*Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 598 (6th Cir.1995) (quoting *Tenney Engineering, Inc. v. United Elec., Radio & Machine Workers of America, Local 437,* 207 F.2d 450, 452 (3d. Cir.1953)).

In addition to the canons of statutory construction, our research indicates that every circuit to consider this issue squarely has found that section 1 of the FAA exempts only the employment contracts of workers actually engaged in the movement of goods in interstate commerce. *See Dickstein v. du-Pont,* 443 F.2d 783, 785 (1st Cir.1971) (Section 1 is limited to employees "involved in, or closely related to, the actual movement of goods in interstate commerce."); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1069 (2d Cir.1972) (Section 1 applies "only to those actually in the transportation industry."); *Tenney Engineering, Inc.,* 207 F.2d at 452 (Section 1 applies only to workers "who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it."); *Rojas,* 87 F.3d at 748 (Section 1 exempts only contracts of employment of workers engaged in the movement of goods in commerce.); *Asplundh*

*Tree Expert Co.,* 71 F.3d at 600–01 (Section 1 "should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce."); *Miller Brewing Co. v. Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1162 (7th Cir.1984) (Section 1 applies only "to workers employed in the transportation industries."). *But see United Elec., Radio & Machine Workers v. Miller Metal Prods., Inc.,* 215 F.2d 221, 224 (4th Cir.1954) (questioning, in dicta, the narrow interpretation of section 1). We have no firm basis upon which to depart from the view endorsed by most of our sister circuits.

The narrow interpretation of the exclusionary clause in section 1 is also supported by the Supreme Court's decision in *Allied– Bruce Terminix Cos.,* 513 U.S. at ——, 115 S.Ct. at 834. *Allied–Bruce Terminix* involved the interpretation of section 2 of the FAA, specifically, whether the language—"a contract evidencing a transaction involving commerce"—extended the Act's reach to the full limits of Congress's commerce clause powers. In concluding that section 2 did reach to the limits of the commerce clause, the Court contrasted the phrase "involving commerce," found in section 2, with the term "in commerce," which is found in the exclusionary clause of section 1:

> The initial interpretive question focuses upon the words "involving commerce." These words are broader than the often-found words of art "in commerce." They therefore cover more than " 'only persons or activities *within the flow* of interstate commerce.' " *United States v. American Building Maintenance Industries,* 422 U.S. 271, 276, 95 S.Ct. 2150, 2154, 45 L.Ed.2d 177 (1975), quoting *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974) (defining "in commerce" as related to the "flow" and defining the "flow" to include "the generation of goods and services for interstate markets and their transport and distribution to the consumer"); see also *FTC v. Bunte Brothers, Inc.,* 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941).

*Allied–Bruce Terminix Cos.*, 513 U.S. at ——, 115 S.Ct. at 839. This analysis strongly suggests that section 1's exclusion of "contracts of employment of seamen, railroad employees, or any other class of workers engaged *in foreign or interstate commerce,*" covers only those workers actually involved in the "flow" of commerce, *i.e.,* those workers responsible for the transportation and distribution of goods.

Finally, although the decision in *Gilmer* did not reach the issue of section 1's scope, *see Gilmer,* 500 U.S. at 25 n. 2, 111 S.Ct. at 1651 n. 2, and did not analyze the arbitration agreement at issue as an employment contract, *see id.,* the majority opinion indicates that the Court would be inclined to read section 1 narrowly, as we do today. *Gilmer* enforced an agreement to arbitrate all employment-related claims that was entered into as a condition of employment. As Justice Stevens's dissent suggests, *see Gilmer,* 500 U.S. at 40, 111 S.Ct. at 1659–60, if the FAA actually excluded all employment contracts from the enforcement provisions of the FAA, it would be anomalous to compel arbitration of Gilmer's employment claims simply because the arbitration agreement was not formally part of a "contract for employment." We believe that the result reached in *Gilmer* implicitly suggests that the FAA does not exclude all contracts of employment.

We recognize that, as Justice Stevens argued in his *Gilmer* dissent, and as appellant argues here, the legislative history of section 1 of the FAA may be read to indicate that Congress intended to exclude all contracts of employment from the coverage of the FAA. *Id.* at 38–39, 111 S.Ct. at 1658–59. *See* Jean R. Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration,* 74 WASH. U. L.Q. 637 (1996) (analyzing history of FAA and its interpretation). Nevertheless, we believe that there are compelling reasons to hold that section 1 of the FAA only excludes from the provisions of the Act the employment contracts of workers engaged in the transportation of goods in commerce. In a case such as this, where the statutory text does not admit of serious ambiguity, and where firmly established case law is absolutely clear

on the meaning of the statute, legislative history is, at best, secondary, and, at worst, irrelevant. *See, e.g., Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 808–09 n. 3, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.").

Furthermore, it is unclear what difference it would make if this case were deemed to be outside the scope of the FAA. The parties' agreement would still be a contract that waives Cole's right to a judicial forum for employment-related claims and agrees to submit those claims to arbitration. Burns would still have the right to seek enforcement of that contract. Although the applicability of the FAA may be significant in the sense that the statute prescribes certain procedural rules that might not otherwise obtain, we have little doubt that, even if an arbitration agreement is outside the FAA, the agreement still may be enforced and the arbitrator's award still may be subject to judicial review. However, we need not resolve this issue in light of our holding that section 1 of the FAA excludes from the FAA only the employment contracts of workers engaged in the transportation of goods in commerce.

B. *The Enforceability of Conditions of Employment Requiring Individual Employees to Arbitrate Claims Resting on Statutory Rights*

We turn now to the heart of the problem in this case, *i.e.,* the enforceability of conditions of employment requiring individual employees to use arbitration in place of judicial fora for the resolution of statutory claims. In considering this question, it is important to understand what this case is *not* about: (1) This is *not* a case in which an employee and an employer, in the face of a legal problem, have made an *ad hoc,* mutually voluntary decision to pursue arbitration or some other form of alternative dispute resolution in lieu of formal litigation. Rather this case involves a situation in which an employee has been required, *as a condition of employ-*

*ment,* to forego all access to jury trials[4] and (at the employer's option) to use arbitration in place of judicial fora for the resolution of statutory as well as contractual claims. (2) This is not a case involving the enforcement of arbitration under a collective bargaining agreement. The employee here is acting alone, without ties to union representation and without any limitations imposed by a collective bargaining contract.

In order to properly consider the validity of the arbitration agreement in this case, it is crucial to emphasize the distinction between arbitration in the context of collective bargaining and mandatory arbitration of *statutory claims* outside of the context of a union contract. These are vastly different situations, involving very different considerations. Arbitration in collective bargaining has a rich tradition in the United States, and a plethora of case law to support it. Arbitration of statutory claims, however, is the proverbial "new kid on the block," mostly an attempt to reduce the burdens and expenses of formal litigation. And arbitration of statutory claims is hardly legendary, for it is not only a new idea, but it comes in no clear form, and it has many detractors. Not surprisingly, because traditional labor arbitration is so celebrated in the United States, it is easy for the uninitiated to fall prey to the suggestion that the legal precepts governing the enforcement and review of arbitration emanating from collective bargaining should be equally applicable to arbitration of *all* employment disputes. This is a mischievous idea, one that we categorically reject.

We will first assess the unique context of mandatory arbitration of statutory claims (outside of collective bargaining), to give clear focus to the issues at hand. We will then consider the specific terms of the arbitration agreement in this case to determine the legality of the disputed arrangement.

1. *The Role of Arbitration: Collective Bargaining and Statutory Claims Distinguished*

American jurisprudence regarding the enforceability of arbitration agreements and the permissible scope of judicial review of arbitration awards has developed most fully in the context of collective bargaining. In that context, strict enforcement of arbitration agreements and minimal review of arbitration awards are both logical and desirable. But the collective bargaining context is quite different from a context in which individuals seek to vindicate statutory rights defined by Congress and arbitration serves merely as a substitute for litigation. As we shall explain, in cases involving statutory rights, blind enforcement of arbitration agreements would undermine congressional intent as reflected in Title VII.

In the Supreme Court's famous *Steelworkers Trilogy,*[5] the Court laid out its vision of the role of arbitration in the context of collective bargaining, as follows:

> In the commercial case, arbitration is the substitute for litigation. Here arbitration is the substitute for industrial strife.... For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself.
>
> The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant....
>
> \* \* \*
>
> ... Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may

---

4. This case does not present, and the court does not decide, any issue with regard to the validity of the waiver of a jury trial in a case that proceeds in court. The parties have not argued that the waiver of a jury trial, independent of the agreement to arbitrate, affects the validity of the contract at issue.

5. *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

... The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement.

*Warrior & Gulf Navigation*, 363 U.S. at 578–79, 581, 80 S.Ct. at 1351, 1352 (citation and footnote omitted).

The Court also recognized that, in the collective bargaining context, arbitrators perform functions different from those performed by courts:

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it.... The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

*Id.* at 581–82, 80 S.Ct. at 1352–53.

Given the unique nature of the collective bargaining process, the Court held that:

[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

*American Manufacturing Co.*, 363 U.S. at 567–68, 80 S.Ct. at 1346.

The Court also held that judicial review of arbitration awards must be circumscribed in order to protect the role of arbitration in the collective bargaining process, because

plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final.... [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Enterprise Wheel*, 363 U.S. at 599, 80 S.Ct. at 1362. This deference, however, is not unlimited.

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361.

Professor Theodore St. Antoine, a preeminent labor law scholar, has aptly explained the arbitrator's role in the context of collective bargaining and the deference accorded to his or her decisions in these terms:

Put most simply, the arbitrator is the parties' officially designated "reader" of the contract. He (or she) is their joint

*alter ego* for the purpose of striking whatever supplementary bargain is necessary to handle the anticipated unanticipated omissions of the initial agreement. Thus, a "misinterpretation" or "gross mistake" by the arbitrator becomes a contradiction in terms. In the absence of fraud or an overreaching of authority on the part of the arbitrator, he is speaking for the parties, and his award *is* their contract.... In sum, the arbitrator's award should be treated as though it were a written stipulation by the parties setting forth their own definitive construction of the contract.

Theodore J. St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at* Enterprise Wheel *and its Progeny,* 75 MICH. L.REV. 1137, 1140 (1977) (footnote omitted), *see also American Postal Workers Union v. U.S. Postal Service,* 789 F.2d 1, 6–7 (D.C.Cir.1986) (adopting Prof. St. Antoine's analysis). Professor St. Antoine's article has been widely recognized as an almost gospel statement on the meaning of the *Steelworkers Trilogy.*

The deference due to arbitrators in the collective bargaining context may be justified even when arbitrators rely on "external" or "public" law in interpreting a collective bargaining agreement.

If a contract clause ... plainly tracks certain statutory language, an arbitrator is within his rights in inferring that the parties intended their agreement to be construed in accordance with the statute. Similarly, the parties may explicitly agree that they will abide by the arbitrator's interpretation of a statute whose meaning is in dispute between them. *In each of these instances, ... technically the arbitrator's award implements the parties' agreement to be bound by his analysis of the statute, rather than by the statute itself.*

St. Antoine, 75 Mich. L.Rev. at 1143 (emphasis added); *see also American Postal Workers Union,* 789 F.2d at 6–7. In these cases, although public law is relevant to determining what contractual rights the parties enjoy, the rights themselves are still privately created contractual rights, not publicly created statutory rights.

In the context of collective bargaining arbitration, there are also unique protections for both parties built into the arbitration process that minimize the risk of unfairness or error by the arbitrator. For example, because both unions and employers are repeat customers of arbitration and have a hand in selecting the arbitrator to hear their disputes, arbitrators who regularly favor one side or the other will not be hired again. As a result, arbitrators have a strong personal interest in crafting awards that will be respected as fair by both parties regardless of who wins or loses the particular dispute. *See, e.g.,* Bernard D. Meltzer, *Ruminations About Ideology, Law, and Labor Arbitration,* PROC. OF THE 20TH ANN. MEETING OF THE NAT'L ACAD. OF ARB. 1, 3–4 (1967); Julius G. Getman, *Labor Arbitration and Dispute Resolution,* 88 YALE L.J. 916, 929–30 (1979).

Additionally, although arbitration awards are final as far as the courts are concerned, they need not be final for the parties. Because the parties to a collective bargaining agreement maintain an ongoing relationship, they remain free to rewrite their contract and thereby "correct" what they perceive to be "errors" on the part of the arbitrator. *See American Postal Workers,* 789 F.2d at 7; Robert A. Gorman, *The* Gilmer *Decision and the Private Arbitration of Public–Law Disputes,* 1995 U. ILL. L. REV. 635, 669; Martin H. Malin & Robert F. Ladenson, *Privatizing Justice: A Jurisprudential Perspective on Labor and Employment Arbitration From the* Steelworkers Trilogy *to* Gilmer, 44 HASTINGS L.J. 1187, 1195 (1993).

Because the legitimacy of the arbitration process and judicial deference to arbitration awards depends heavily upon unique features of the collective bargaining process, it is not surprising that many commentators have questioned the logic and desirability of extending arbitral jurisprudence developed in labor cases beyond the confines of the collective bargaining context.

To extend the special status that arbitration enjoys under the Trilogy—the twin features of a virtually all-embracive presumption of arbitrability and a sharply limited role for the courts—to settings where collective bargaining does not take place

would be to divorce the Court's doctrine from its underlying justification, its mooring in a particular institution of industrial governance premised on collective representation of workers and joint labor-management determination of basic terms and conditions of employment.

Samuel Estreicher, *Arbitration of Employment Disputes without Unions*, 66 CHI.-KENT L. REV. 753, 758 (1990); *see also* Gorman, 1995 U. ILL. L. REV. at 678 ("Given the very different purposes, sources, and dynamics of grievance arbitration under collective agreements, that model cannot be imposed unquestioningly upon the post-*Gilmer* world of public-law arbitration."); G. Richard Shell, *ERISA and Other Federal Employment Statutes: When Is Commercial Arbitration an "Adequate Substitute" For the Courts?*, 68 TEX. L. REV. 509, 511–15 (1990) (discussing the two distinct models of arbitration in collective bargaining and statutory cases and the importance of maintaining distinction in analyzing features of arbitration).

The reasons for this hesitation to extend arbitral jurisprudence from the collective bargaining context are well-founded. The fundamental distinction between contractual rights, which are created, defined, and subject to modification by the same private parties participating in arbitration, and statutory rights, which are created, defined, and subject to modification only by Congress and the courts, suggests the need for a public, rather than private, mechanism of enforcement for statutory rights.

[A] private agreement to arbitrate statutory claims cannot be viewed entirely in terms of a calculus of private gain and loss that presumably is best left to the parties themselves.... If the award purports to resolve a claim under external law (and hence preclude relitigation of that claim in any other forum), there is a public interest in the manner in which the external-law norms are articulated and applied in the arbitral forum. Thus, ... when arbitrators sit to adjudicate a dispute governed by external law, there is a tension between the tradition of limited judicial review of arbitration awards and the presence of an independent public interest in ensuring that the law is correctly and consistently being applied, and that substantive policies reflected in the law are neither under-enforced nor over-enforced.

Estreicher, 66 CHI.-KENT L. REV. at 777; *see also* Lamont E. Stallworth & Martin H. Malin, *Conflicts Arising Out of Work Force Diversity*, PROC. OF THE 46TH ANN. MEETING OF THE NAT'L ACAD. OF ARB. 104, 119 (1994) ("Many issues of public law require a choice between conflicting public values, which should be resolved by judges and other officials charged with lawmaking in the public interest, rather than by private dispute resolvers.").

Whereas an arbitrator serves as an agent or "alter ego" for the parties to a collective bargaining agreement, an arbitrator who resolves statutory claims serves simply as a private judge. *See* Shell, 68 TEX. L. REV. at 512. Yet, unlike a judge, an arbitrator is neither publicly chosen nor publicly accountable.

Arbitration of public law issues is also troubling, on a less abstract level, because the structural protections inherent in the collective bargaining context are not duplicated in cases involving mandatory arbitration of individual statutory claims. Unlike the labor case, in which both union and employer are regular participants in the arbitration process, only the employer is a repeat player in cases involving individual statutory claims. As a result, the employer gains some advantage in having superior knowledge with respect to selection of an arbitrator. *See, e.g.,* Lewis Maltby, *Paradise Lost—How the* Gilmer *Court Lost the Opportunity for Alternative Dispute Resolution to Improve Civil Rights*, 12 N.Y.L. SCH. J. HUM. RTS. 1, 4–5 (1994) (arguing that individual employees are disadvantaged vis-a-vis employers in determining whether given arbitrator is truly neutral because employees lack financial resources to research arbitrator's past decisions); Sternlight, 74 WASH. U. L.Q. at 685 (arguing that "one-shot players" such as employees and consumers are less able to make informed selections of arbitrators than "repeat-player" companies); Getman, 88 YALE L.J. at 936 (same); Gorman, 1995 U. ILL. L.REV. at 656 (same);

Reginald Alleyne, *Statutory Discrimination Claims: Rights "Waived" and Lost In the Arbitration Forum,* 13 HOFSTRA LAB. L.J. 381, 403, 426 (1996) (same).

Additionally, while a lack of public disclosure of arbitration awards is acceptable in the collective bargaining context, because both employers and unions monitor such decisions and the awards rarely involve issues of concern to persons other than the parties, in the context of individual statutory claims, a lack of public disclosure may systematically favor companies over individuals. Judicial decisions create binding precedent that prevents a recurrence of statutory violations; it is not clear that arbitral decisions have any such preventive effect. The unavailability of arbitral decisions also may prevent potential plaintiffs from locating the information necessary to build a case of intentional misconduct or to establish a pattern or practice of discrimination by particular companies. *See* Sternlight, 74 Wash. U. L.Q. at 686.

Furthermore, as in the instant case, mandatory arbitration agreements in individual employees' contracts often are presented on a take-it-or-leave-it basis; there is no union to negotiate the terms of the arbitration arrangement. Thus, employers are free to structure arbitration in ways that may systematically disadvantage employees. *See* Alfred W. Blumrosen, *Exploring Voluntary Arbitration of Individual Employment Disputes,* 16 U. MICH. J.L. REFORM 249, 254–55 (1983) ("In non-unionized private sector employment, there is no organization analogous to the union to represent employee interests in developing arbitration procedures. Therefore, the employer and its lawyers have a comparatively free hand in drafting the details of an arbitration clause.... Under these circumstances, some employers may seek to unfairly narrow the legal rights of employees in the arbitration clause." (footnote omitted)); L.M. Sixel, *Case Leads Employers to Rethink Arbitration Rules,* HOUSTON CHRON., Jan. 29, 1996, *available in* 1996 WL 5579081 ("Starting about three years ago, employers trying to avoid big, expensive lawsuits began forcing their employees to agree to binding arbitration in order to keep their jobs or get new ones. And many em-

ployers adopted stiff, self-serving arbitration rules that, for example, prohibit punitive damages or put severe limits on evidence-gathering by employees.").

For example, a company might impose a requirement that the employee pay the fees for an arbitrator's time in order to discourage or prevent employees from bringing a claim. *See* Blumrosen, 16 U. MICH. J.L. REFORM at 262 (proposing model arbitration clause that requires employer to pay arbitrator's fees because "to tax the employee with the burden of paying for a private judge might seem overreaching" when the employer is already "avoiding the risk of a jury trial"); Sternlight, 74 Wash. U. L.Q. at 682–83 (suggesting ways employers might structure arbitration to discourage claims, including requiring employees to pay arbitrators' fees, and noting that "at least when one goes to court the judge is free"); Ellie Winninghoff, *In Arbitration, Pitfalls For Consumers,* N.Y. TIMES, Oct. 22, 1994, at 37 (An attorney with arbitration experience says it is a myth "that [arbitration is] cheaper—that's definitely not true. If you go to trial, you get the judge for free.").

Finally, the competence of arbitrators to analyze and decide purely legal issues in connection with statutory claims has been questioned. Many arbitrators are not lawyers, and they have not traditionally engaged in the same kind of legal analysis performed by judges.

For instance, arbitrators often cite to and rely extensively on treatises.... A court is unlikely to rely on a treatise—even ... a widely respected one. Similarly, arbitrators frequently rely on leading cases on the subject of employment discrimination, such as *Texas Department of Community Affairs v. Burdine (Burdine),* and *McDonnell Douglas Corp. v. Green (McDonnell Douglas),* without citing to subsequent lower courts or less publicized cases. This means that an arbitrator's decision may be based on broad stroke principles to the exclusion of cases more analogous to the claim being decided.

Nor do arbitrators always analyze an intentional discrimination case within the judicially accepted three-prong framework

articulated by the Supreme Court in *Burdine* and *McDonnell Douglas*.

Richard H. Block & Elizabeth A. Barasch, *Practical Ramifications of Arbitration of Employment Discrimination Claims*, PROC. OF N.Y.U. 44TH ANN. CONF. ON LAB. 281, 294 (1991) (footnotes omitted); *see also* C. Evan Stewart, *Securities Arbitration Appeal: An Oxymoron No Longer?*, 79 KY. L.J. 347, 359 n.57 (1990/1991) (noting and documenting longstanding concern in securities industry over arbitrators' lack of training and qualifications to handle complex statutory cases); Harry T. Edwards, *Arbitration of Employment Discrimination Cases: An Empirical Study*, PROC. OF THE 28TH ANN. MEETING OF THE NAT'L ACAD. OF ARB. 59, 71–72 (1976) (reporting that at least 16% of arbitrators have never read any judicial opinions involving Title VII; 40% do not read labor advance sheets to keep abreast of developments under Title VII; and of those arbitrators who have never read a judicial opinion on employment discrimination and who do not read advance sheets, 50% nonetheless feel professionally competent to decide legal issues in cases involving employment discrimination).

Many of these concerns were raised by the Supreme Court to explain its initial hesitation to endorse the arbitration of statutory claims. *See, e.g., Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 54–59, 94 S.Ct. 1011, 1022–25, 39 L.Ed.2d 147 (1974) (holding that grievance arbitration of discrimination claim does not preclude subsequent litigation of Title VII claim or require deferral by court to arbitration award); *Wilko v. Swan*, 346 U.S. 427, 438, 74 S.Ct. 182, 188–89, 98 L.Ed. 168 (1953) (claims under Securities Act of 1933 not subject to arbitration). The Court questioned, for example, arbitrators' competence to decide legal issues, noting that "the resolution of statutory or constitutional issues is a primary responsibility of courts, and judicial construction has proved especially necessary with respect to Title VII, whose broad language frequently can be given meaning only by reference to public law concepts." *Gardner–Denver*, 415 U.S. at 57, 94 S.Ct. at 1024. The Court also worried that because the records of arbitration proceedings are incomplete, discovery is abbreviated, cross-examination and testimony under oath

may be limited or unavailable, and arbitrators need not give the reasons for an award, arbitration could not appropriately substitute for the federal courts in resolving statutory issues under Title VII. *See id.* at 57–58, 94 S.Ct. at 1024–25; *see also Wilko*, 346 U.S. at 435–36, 74 S.Ct. at 186–87 (questioning arbitrators' understanding of legal concepts and worrying that lack of complete record of proceedings and explanation of awards will prevent adequate judicial review).

Nonetheless, the Supreme Court now has made clear that, as a general rule, statutory claims are fully subject to binding arbitration, at least outside of the context of collective bargaining. *See Gilmer*, 500 U.S. at 26, 34–35, 111 S.Ct. at 1652, 1656–57 (collecting cases and distinguishing *Gardner–Denver*). Rejecting "generalized attacks on arbitration" of statutory claims as based " 'on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants' " and " 'far out of step with [the] current strong endorsement' " of arbitration, *id.* at 30, 111 S.Ct. at 1654 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481, 109 S.Ct. 1917, 1920, 104 L.Ed.2d 526 (1989)), the Court has emphasized that " '[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Id.* at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)). The Court has stressed that " '[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.' " *Id.* at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. at 3359).

It is plain that the Supreme Court saw a critical distinction in the situations raised by *Gardner–Denver* and *Gilmer*: *Gardner–Denver* involved arbitration in the context of collective bargaining, which almost invariably means that the union controls the presentation of the statutory issue to the arbitrator.

Thus, the *Gardner–Denver* Court knew that arbitration might not be fair to the individual employee, because an arbitrator would of necessity be required to deal with the union's interests vis-a-vis the employer, and the union's interests are not necessarily the same as the employee's interests, especially with respect to a claim of employment discrimination. *Gilmer*, on the other hand, raised an individual employee claim outside the collective bargaining context, so the pitfalls seen in *Gardner–Denver* did not present themselves in *Gilmer. See Gilmer*, 500 U.S. at 34–35, 111 S.Ct. at 1656–57.

Despite the Supreme Court's recent endorsement of arbitration of statutory claims, however, concerns remain regarding arbitration's ability to live up to the Court's expectations, particularly in cases involving mandatory arbitration of statutory claims which is imposed as a condition of employment. In fact, the Equal Employment Opportunity Commission has taken the position that such agreements are unenforceable in a number of cases being litigated around the country. *See, e.g., Duffield v. Robertson Stephens & Co.*, No. C–95–0109–EFL (N.D. Cal.) (amicus brief filed by EEOC); *Cosgrove v. Shearson Lehman Bros.*, No. 95–3432, 1997 WL 4783 (6th Cir.1997) (amicus brief filed by EEOC); *EEOC v. River Oaks Imaging & Diagnostic*, Civ. A. H–95–75 (S.D. Tex.); *EEOC v. Midland Food Services, LLC*, No. 1:96–MC–107 (N.D. Ohio); *Johnson v. Hubbard Broadcasting, Inc.*, No. 4–96–cv–107 (D. Minn.) (amicus brief filed by EEOC). In *Duffield*, the agency's position was stated as follows:

> "The Commission strongly favors the voluntary use of arbitration and other forms of alternative dispute resolution ("ADR"), and believes that properly used it can speed and simplify the process of adjudicating discrimination claims. However, arbitration that is not knowing and voluntary deprives individuals of substantial rights provided by Congress, especially where— as alleged here—the procedures are unfair

and specifically designed *not* to safeguard statutory rights."

Pierre Levy, Gilmer *Revisited: The Judicial Erosion of Employee Statutory Rights,* 26 N.M. L. Rev. 455, 478 n.193 (1996) (quoting Memorandum of Points and Authorities of the EEOC as Amicus Curiae, *Duffield v. Robertson Stephens & Co.*, No. C–95–0109– EFL at 1 (N.D. Cal. filed Aug. 4, 1995) ("EEOC Memorandum")). The EEOC's objections to the procedures at issue were described as follows:

> [Arbitration] (1) is not governed by the statutory requirements and standards of Title VII; (2) is conducted by arbitrators given no training and possessing no expertise in employment law; (3) routinely does not permit plaintiffs to receive punitive damages and attorneys' fees to which they would otherwise be entitled under the statute; and (4) forces them to pay exorbitant "forum fees" in the tens of thousands of dollars, greatly discouraging aggrieved employees from seeking relief.

*Id.* at 478 (quoting EEOC Memorandum at 3).

The National Labor Relations Board also has expressed some concerns. At one point, officials with the Board took the position that it is an unfair labor practice to require an employee to agree to mandatory arbitration of all claims. *See* Margaret A. Jacobs, *Firms With Policies Requiring Arbitration Are Facing Obstacles,* WALL ST. J., Oct. 16, 1995, at B5 (quoting Rochelle Kentov, regional director of the NLRB in Tampa, Florida as saying, "The requirement that an employee or job applicant sign a mandatory arbitration policy is an unfair labor practice, as is their discharge for not signing").[6]

With this background in mind, we turn to the arbitration agreement before us in this case.

2. *The Validity of the Agreement to Arbitrate in This Case*

██ We start with the assumption that, under *Gilmer*, a person may agree to arbi-

---

6. Recently, however, Board officials appear to have tempered their position. The General Counsel's Report suggests that the NLRB will only find an unfair labor practice if a mandatory arbitration agreement inhibits employees' ability to file charges with the NLRB. *See NLRB General Counsel Report, January to September 1995,* DAILY LAB. REP. (BNA) No. 36, at E–6–7 (Feb. 23, 1996).

trate statutory claims. We do not assume, however, that an employer has a free hand in requiring arbitration as a condition of employment.

Fortunately, in the instant case, the parties largely agree on the meaning of their arbitration agreement. Each side concurs in the following propositions:

(1) The agreement allows the employer the option of forcing statutory claims into arbitration for the resolution of public law issues;

(2) The agreement's waiver of a jury trial is absolute, *i.e.*, it operates even if the employer does not seek arbitration;

(3) The agreement does not affect an employee's ability to seek relief from the Equal Employment Opportunity Commission;

(4) The arbitrator is fully bound to apply Title VII and other applicable public law, both as to substance and remedy, in accordance with statutory requirements and prevailing judicial interpretation; and

(5) The agreement provides for appointment of a neutral arbitrator through the American Arbitration Association ("AAA") and for the conduct of the arbitration proceeding in accordance with AAA rules.

The provisions of the AAA Rules[7] immediately relevant to our analysis are as follows:

(1) Rule 7: The arbitrator has "the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute;"

(2) Rule 32(b): "The award shall be in writing and shall be signed by a majority of the arbitrators and shall provide the written reasons for the award unless the parties agree otherwise;"

(3) Rule 32(c): "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including, but not limited to, any remedy or relief that would have been available to the parties had the matter been heard in court;"

(4) Rule 35: A filing fee of $500 must be advanced by the initiating party, subject to final apportionment by the arbitrator in the award, and an administrative fee of $150 per hearing day must be paid by each party, but the AAA "may, in the event of extreme hardship on any party, defer or reduce the administrative fees;"

(5) Rule 36: The expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and witnesses, will be shared equally by the parties, unless the parties agree otherwise or the arbitrator directs otherwise in the award;

(6) Rule 37: The parties are to agree with the arbitrator on appropriate compensation for the arbitrator's work, but if the parties cannot agree with the arbitrator on a rate of compensation, the arbitrator's fee will be set by AAA. Payment of the arbitrator's fee is made through AAA, not directly between the parties and the arbitrator.

The parties stipulated that arbitrators' fees are commonly $500 to $1,000 *or more* per day.[8] Significantly, however, the AAA Rules

---

**7.** *National Rules for the Resolution of Employment Disputes*, American Arbitration Association (effective June 1, 1996) ("AAA Rules").

**8.** AAA cites $700 per day as the average arbitrator's fee. Kenneth May, *Labor Lawyers at ABA Session Debate Role of American Arbitration Association*, DAILY LAB. REP. (BNA) No. 31, at A–12 (Feb. 15, 1996). JAMS/Endispute arbitrators charge an average of $400 *per hour. See* Alleyne, 13 HOFSTRA LAB L.J. at 410 n.189. However, fees of $500 or $600 per hour are not uncommon. *See* Margaret A. Jacobs, *Renting Justice: Retired Judges Seize Rising Role in Settling Disputes in*

*California*, WALL ST. J., July 27, 1996, at A1; David Segal, *Have Name Recognition, Will Mediate Disputes*, WASH. POST, Dec. 16, 1996, Wash. Bus. at 5. CPR Institute for Dispute Resolution estimates arbitrators' fees of $250–$350 per hour and 15–40 hours of arbitrator time in a typical employment case, for total arbitrators' fees of $3,750 to $14,000 in an "average" case. *See* CPR INST. FOR DISPUTE RESOLUTION, EMPLOYMENT ADR: A DISPUTE RESOLUTION PROGRAM FOR CORPORATE EMPLOYERS I–13 (1995).

do not prescribe any particular allocation of responsibility for the payment of the arbitrators' fees.

Our dissenting colleague has it completely wrong in suggesting that the applicable AAA Rules determine the allocation of the Neutral Arbitrator's Compensation. They do not. Rule 32 says, in relevant part, that "the arbitrator shall ... assess arbitration fees, expenses, and compensation *as provided in Sections 35, 36, and 37....*" Rule 37 (entitled "Neutral Arbitrator's Compensation"), in turn, says that "[a]n appropriate daily rate and other arrangements will be discussed by the administrator with the parties and the arbitrator. If the parties fail to agree to the terms of compensation, an appropriate rate shall be established by the AAA and communicated in writing to the parties." Nothing in these rules indicates how an arbitrator's compensation is to be allocated. Instead, it is quite clear that AAA hedged on this question in the *National Rules for the Resolution of Employment Disputes* (effective June 1, 1996) (probably because the issue was seen to be so controversial). In contrast, in the AAA *Labor Arbitration Rules,* at 16 (as amended and effective January 1, 1996), it is clearly provided that, "[u]nless mutually agreed otherwise, the arbitrator's compensation shall be borne equally by the parties, in accordance with the fee structure disclosed in the arbitrator's biographical profile submitted to the parties." There is no such provision in the *National Rules for the Resolution of Employment Disputes.* It is therefore unclear in the instant case whether an arbitrator's fees (as distinguished from "administrative fees") are to be paid by the employee alone, the employer alone, or by the parties together. For the reasons that follow, we hold that an arbitrator's compensation and expenses must be paid by the employer alone.

The starting point of our analysis is the Supreme Court's decision in *Gilmer.* In that case, the Court held that an employee's agreement to arbitrate employment-related disputes may require him to arbitrate statutory claims under the ADEA because "[b]y agreeing to arbitrate a statutory claim, [an employee] does not forgo the substantive rights afforded by the statute; [he] only

submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354) (first alteration in original). As noted above, the Court emphasized that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.* at 28, 111 S.Ct. at 1653 (quoting *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. at 3359) (alteration in original).

In *Gilmer,* the employee raised four challenges to arbitration under the New York Stock Exchange Rules, claiming that arbitration impermissibly diminished his ability to effectively vindicate his statutory rights. First, Gilmer challenged the impartiality of the arbitrators. *See id.* at 30, 111 S.Ct. at 1654. The Court rejected this challenge, finding that the NYSE Rules themselves provide protection against biased arbitrators and that judicial review under the FAA would allow the courts to set aside any decision in which there "was evident partiality or corruption in the arbitrators." *Id.* at 30–31, 111 S.Ct. at 1654 (quoting 9 U.S.C. § 10(b)). Second, Gilmer objected that the limited discovery allowed in arbitration would unfairly hamper his ability to prove discrimination. *Id.* at 31, 111 S.Ct. at 1654–55. Again, the Court rejected this claim, pointing out that the NYSE Rules provided for discovery and that agreements to arbitrate are desirable precisely because they trade the procedures of the federal courts for the simplicity, informality, and expedition of arbitration. *Id.* (quotation omitted). Third, Gilmer objected that, because arbitrators do not always issue written awards, public knowledge of discrimination, appellate review, and the development of the law would be undermined by arbitration of his statutory claims. *Id.* This claim too was rejected because, in fact, the NYSE Rules require that arbitration awards be in writing and allow public access to awards. *Id.* at 31–32, 111 S.Ct. at 1654–55. Finally, Gilmer's objection that arbitration did not provide for equitable relief was rejected because the NYSE Rules did not re-

strict the types of relief available.[9]  *Id.* at 32, 111 S.Ct. at 1655.

Obviously, *Gilmer* cannot be read as holding that an arbitration agreement is enforceable no matter what rights it waives or what burdens it imposes.  *See* Gorman, 1995 U. ILL. L. REV. at 644 ("The Supreme Court in the *Gilmer* case did not hold that *any* sort of arbitration procedure before *any* manner of arbitrator would be satisfactory in the adjudication of public rights.").  Such a holding would be fundamentally at odds with our understanding of the rights accorded to persons protected by public statutes like the ADEA and Title VII.  The beneficiaries of public statutes are entitled to the rights and protections provided by the law.  Clearly, it would be unlawful for an employer to condition employment on an employee's agreement to give up the right to be free from racial or gender discrimination.  *See Gardner–Denver*, 415 U.S. at 51, 94 S.Ct. at 1021 ("[T]here can be no prospective waiver of an employee's rights under Title VII....  Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices....  [W]aiver of these rights would defeat the paramount congressional purpose behind Title VII.").[10]  Any such condition of employment would violate Title VII, regardless of whether or not the agreement was viewed as a contract of adhesion.  Thus, in a subsequent suit by the employee raising a viable claim of racial discrimination or sexual harassment, it would be no defense that the employee had signed a contract giving up her right to be free from discrimination.

■  Similarly, an employee cannot be required as a condition of employment to waive access to a neutral forum in which statutory employment discrimination claims may be heard.  For example, an employee could not be required to sign an agreement waiving the right to bring Title VII claims in any forum.  Although the employer could argue that such an agreement does not waive the substantive protections of the statute, surely such an agreement would nonetheless violate the law by leaving the employee's substantive rights at the mercy of the employer's good faith in adhering to the law.  At a minimum, statutory rights include both a substantive protection *and* access to a neutral forum in which to enforce those protections.  *See Graham Oil Co. v. ARCO Products Co.*, 43 F.3d 1244, 1246–48 (9th Cir.1994) (arbitration clause that purported to waive remedies provided by federal statute and to shorten statute of limitations for filing such claims violated statute and was unenforceable); JEROLD S. AUERBACH, JUSTICE WITHOUT LAW? 144–45 (1983) (preservation of "individual rights requires an accessible legal system for their protection" and enforcement).

We believe that all of the factors addressed in *Gilmer* are satisfied here.  In particular, we note that the arbitration arrangement (1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs *or* any arbitrators' fees or expenses as a condition of access to the arbitration forum.  Thus, an employee who is made to use arbitration as a condition of employment "effectively may vindicate [his or her] statutory cause of action in the arbitral forum."  *Gilmer*, 500 U.S. at 28, 111 S.Ct. at 1653 (alteration in original) (internal

---

**9.**  In holding that customer claims under the Securities Exchange Act are subject to arbitration, the Court relied, in part, on the fact that the Securities Exchange Commission ("SEC") has broad authority to oversee and regulate the rules adopted by the NYSE and National Association of Securities Dealers ("NASD") for arbitration of customer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights under the securities laws.  *See McMahon*, 482 U.S. at 234, 107 S.Ct. at 2341–42.  The oversight provided by the SEC extends to employment claims by securities industry employees.  In contrast, Cole and others outside the securities industry do not have the benefit of any external check on their employers' ability to structure arbitration procedures.

**10.**  *See also Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir.1995) ("It is the general rule in this circuit that an employee may not prospectively waive his or her rights under either Title VII or the ADEA."); *Kendall v. Watkins*, 998 F.2d 848, 851 (10th Cir.1993) (" '[T]here can be no prospective waiver of an employee's rights under Title VII.' " (quoting *Gardner–Denver*)).

quotation omitted); *see* Gorman, 1995 U. ILL. L. REV. at 645 ("[D]espite the strong FAA policy of ordering arbitration hearings and implementing arbitration awards, minimal standards of procedural fairness must be satisfied before a civil action may be stayed and arbitration ordered.... [A] federal court, before enforcing an employer's demand for arbitration under an employment contract, may—indeed must—scrutinize the agreed-upon or contemplated arbitration system.").[11]

### 3. *The Obligation to Pay Arbitrators' Fees*

■ Although we find that the disputed arbitration agreement is legally valid, there is one point that requires amplification. The arbitration agreement in this case presents an issue not raised by the agreement in *Gilmer*: can an employer condition employment on acceptance of an arbitration agreement that requires the employee to submit his or her statutory claims to arbitration and then requires the employee to pay all or part of the arbitrators' fees? This was not an issue in *Gilmer* (and other like cases), because, under NYSE Rules and NASD Rules, it is standard practice in the securities industry for employers to pay all of the arbitrators' fees. *See* DAILY LAB. REP. (BNA) No. 93 at A–3 (May 14, 1996). Employees may be required to pay a filing fee, expenses, or an administrative fee, but these expenses are

---

11. Recently, the Department of Labor Commission on the Future of Worker-Management Relations ("Dunlop Commission"), chaired by John T. Dunlop, a former Secretary of Labor and current Professor Emeritus at Harvard University, endorsed a consensus view among employers and employees that:

> if private arbitration is to serve as a legitimate form of private enforcement of public employment law, these systems must provide:
> a neutral arbitrator who knows the laws in question and understands the concerns of the parties;
> a fair and simple method by which the employee can secure the necessary information to present his or her claim;
> a fair method of cost-sharing between the employer and employee to ensure affordable access to the system for all employees;
> the right to independent representation if the employee wants it;
> a range of remedies equal to those available through litigation;
> a written opinion by the arbitrator explaining the rationale for the result; and
> sufficient judicial review to ensure that the result is consistent with the governing laws.

COMMISSION ON THE FUTURE OF WORKER-MANAGEMENT RELATIONS, REPORT AND RECOMMENDATIONS 30–31 (1994).

Others have suggested similar safeguards:

> [T]he premise of the [Supreme] Court's rulings ... is that arbitration entails only a waiver of a procedural right to a judicial forum rather than a waiver of any substantive right accorded by the statute. Consistent with that premise, the arbitrator is obligated to decide the dispute in conformity with the substantive standards of the statute and should have the authority to award whatever injunctive or monetary relief is necessary to remedy a proven statutory violation. The court should review the award for conformity with applicable legal standards and to ensure that findings of fact are not clearly erroneous. Moreover, in order to permit meaningful review by the court, a transcript of the hearings should be kept and the award should be accompanied by an opinion containing findings of fact and reasons for the manner of disposition of the statutory claim.

Estreicher, 66 CHI.-KENT L.REV. at 791 (footnote omitted); *see also Statement by Professor Samuel Estreicher To The Commission On The Future of Worker–Management Relations Panel on Private Dispute Resolution Alternatives,* DAILY LAB. REP. (BNA) No. 188, at D–1 (Sept. 30, 1994); TASK FORCE ON ALTERNATIVE DISPUTE RESOLUTION IN EMPLOYMENT, DUE PROCESS PROTOCOL (1995), *reprinted in* Supplemental Post–Argument Brief of Appellee at App. 2; COMMITTEE ON LABOR AND EMPLOYMENT LAW, BAR ASS'N OF THE CITY OF NEW YORK, *Final Report on Model Rules for the Arbitration of Employment Disputes,* 50 Rec. 629 (1995).

In response to the overwhelming unanimity of opposition to employer manipulation of procedures for the arbitration of employment disputes, JAMS/Endispute, a large provider of arbitration services, recently announced that it will not accept arbitration assignments in employment cases unless the arbitration agreement: (1) provides the same rights and remedies available to the individual under applicable federal, state, and local law; (2) permits the employee to participate in the selection of a neutral arbitrator; (3) allows the employee the right to be represented by counsel; (4) allows reasonable discovery prior to the arbitration hearing; and (5) ensures that the employee has the right to present his or her proof through testimony, documentary evidence, and cross-examination. JAMS/Endispute will also defer arbitration if a party wishes to challenge the enforceability of a mandatory arbitration clause in court. *See* Mark L. Goldstein & Andrea H. Stempel, *Mandatory Arbitration Claus-*

routinely waived in the event of financial hardship.

Thus, in *Gilmer*, the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator assigned to hear their statutory claims. There is no reason to think that the Court would have approved arbitration in the absence of this arrangement. Indeed, we are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or his case. Under *Gilmer*, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.

There is no doubt that parties appearing in federal court may be required to assume the cost of filing fees and other administrative expenses, so any reasonable costs of this sort that accompany arbitration are not problematic.[12] However, if an employee like Cole is required to pay arbitrators' fees ranging from $500 to $1,000 per day *or more, see* note

8 *supra*,[13] in addition to administrative and attorney's fees, is it likely that he will be able to pursue his statutory claims? We think not. *See* David W. Ewing, JUSTICE ON THE JOB: RESOLVING GRIEVANCES IN THE NONUNION WORKPLACE (Harvard Business School Press 1989) at 291 (quoting corporate director of industrial relations at Northrop explaining why Northrop pays arbitrators' fees: "[W]e bear the cost of the arbitration for the very practical reason that most of the employees who seek arbitration of their grievances simply couldn't afford it if we did not.").[14] There is no indication in AAA's rules that an arbitrator's fees may be reduced or waived in cases of financial hardship. These fees would be prohibitively expensive for an employee like Cole, especially after being fired from his job, and it is unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court.[15]

Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. In such a

---

*es In Employment Contracts*, N.Y.L.J., Oct. 29, 1996, at 1.

**12.** Even if an employee is not required to pay any portion of an arbitrator's fee, arbitration in a program such as the one administered by AAA is hardly inexpensive. Under the AAA plan, Cole could be required to pay a filing file of $500.00 (as compared with the $120.00 filing fee that he paid to pursue his claim in District Court), administrative fees of $150.00 per day, room rental fees, and court reporter fees (and, of course, attorneys' fees, if he employs an attorney).

The filing fee and other administrative fees imposed by AAA may be reduced or deferred in cases of hardship. *See* AAA Rule 35. Because Cole has not challenged the administrative fees charged by AAA, we do not address whether the AAA's refusal to waive filing and other administrative fees could preclude enforcement of an arbitration agreement. We assume, for purposes of this case, that employees who would quality for *in forma pauperis* status in the federal courts will similarly qualify for a waiver of fees under the AAA Rules.

**13.** For a general description of the some of the huge amounts of money involved in the arbitration business, *see, e.g.,* Kathryn Kranhold, *Solo*

*Legal Arbitrators Put Longtime Leader in a Jam,* WALL ST. J., Nov. 13, 1996, *available in* 1996 WL-WSJ 11805966; Margaret A. Jacobs, *Renting Justice: Retired Judges Seize Rising Role in Settling Disputes in California,* WALL ST. J., July 27, 1996, at A1.

**14.** *See also* BROWN & ROOT, INC., DISPUTE RESOLUTION PLAN AND RULES (Sept.1994), RULE 32.C. (capping employee contribution for costs of arbitration fees and expenses at $50 in cases initiated by employee); U.S. GEN. ACCOUNTING OFFICE, REPORT TO CONGRESSIONAL REQUESTERS: EMPLOYMENT DISCRIMINATION: MOST PRIVATE EMPLOYERS USE ALTERNATIVE DISPUTE RESOLUTION, GAO/HEHS–95–150 at 14 (1995) (finding that, when arbitration plans address the distribution of responsibility for arbitrators' fees, a majority of plans either cap the employee's share or provide for the employer to pay all arbitration costs).

**15.** We use the term "arbitrators' fees" to include not only the arbitrator's honorarium, but also the arbitrator's expenses and any other costs associated with the arbitrator's services. To the extent that AAA Rule 36, which requires the parties to share the expenses of arbitration, is to the con-

circumstance—where arbitration has been imposed by the employer and occurs only at the option of the employer—arbitrators' fees should be borne solely by the employer.

Some commentators have suggested that it would be a perversion of the arbitration process to have the arbitrator paid by only one party to the dispute.[16] We fail to appreciate the basis for this concern. If an arbitrator is likely to "lean" in favor of an employer—something we have no reason to suspect—it would be because the employer is a source of future arbitration business,[17] and not because the employer alone pays the arbitrator. It is doubtful that arbitrators care about who pays them, so long as they are paid for their services.

Furthermore, there are several protections against the possibility of arbitrators systematically favoring employers because employers are the source of future business. For one thing, it is unlikely that such corruption would escape the scrutiny of plaintiffs' lawyers or appointing agencies like AAA. Corrupt arbitrators will not survive long in the business. In addition, wise employers and their representatives should see no benefit in currying the favor of corrupt arbitrators, because this will simply invite increased judicial review of arbitral judgments. Finally, if the arbitrators who are assigned to hear and decide statutory claims adhere to the professional and ethical standards set by arbitrators in the context of collective bargaining,

there is little reason for concern.[18] In this sense, the rich tradition of arbitration in collective bargaining *does* serve as a valuable model.

■ In sum, we hold that Cole could not be required to agree to arbitrate his public law claims as a condition of employment if the arbitration agreement required him to pay all or part of the arbitrator's fees and expenses. In light of this holding, we find that the arbitration agreement in this case is valid and enforceable. We do so because we interpret the agreement as requiring Burns Security to pay all of the arbitrator's fees necessary for a full and fair resolution of Cole's statutory claims.

■■ As we noted earlier, the disputed agreement does not explicitly address this issue; it merely incorporates the provisions of the AAA Rules. However, the AAA Rules are also silent on this point, so there is no clear allocation of responsibility for payment of arbitrator's fees. It is well understood that, where a contract is unclear on a point, an interpretation that makes the contract lawful is preferred to one that renders it unlawful. *See 1010 Potomac Assoc. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984) (a contract "must be interpreted as a whole, giving a reasonable, *lawful*, and effective meaning to all its terms." (emphasis added)); *Vicki Bagley Realty, Inc. v. Laufer*,

---

trary, it may not be enforced against an employee like Cole.

**16.** *See, e.g.*, Task Force on Alternative Dispute Resolution in Employment, Due Process Protocol § C.6 (May 9, 1995), *reprinted in* Supplemental Post–Argument Brief of Appellee at App. 2.

**17.** *See, e.g.*, Mark Berger, *Can Employment Law Arbitration Work?*, 61 U. Mo.–Kan. City L. Rev. 693, 714 (1993) ("[S]ince employers rather than individual employees are more likely to have repeat participation in the employment dispute arbitration process, arbitrators are more likely to rule in their favor in order to increase their chances of being selected to arbitrate future claims."); Getman, 88 Yale L.J. at 936 (same); Gorman, 1995 U. Ill. L. Rev. at 656 (same); Block & Barasch, Proc. of N.Y.U. 44th Ann. Nat'l Conf. on Lab. at 298 (arbitrators have financial interest in pleasing employers who may be frequent users of arbitration by either denying employee claims or limiting relief awarded); Alleyne, 13 Hofstra Lab. L.J. at

426 (noting temptation for arbitrators to favor institutional employer interests).

One empirical study that found that employees recover less on their claims against repeat-player companies, defined as companies that use arbitration more than once in a year, than they do against non-repeat players. *See* Sternlight, 74 Wash. U. L.Q. at 685 (citing unpublished study by Prof. Lisa Bingham); David Segal, *Short–Circuiting the Courts; An Overburdened Legal System Has Turned Mediation Into Big Business*, Wash. Post, Oct. 7, 1996, at F12 (Bingham study shows that repeat-player employers win in arbitration twice as often as non-repeat players). It is hard to know what to make of these studies without assessing the relative *merits* of the cases in the surveys.

**18.** *See* Harry T. Edwards, *Advantages of Arbitration Over Litigation: Reflections of a Judge*, Proc. of the 35th Ann. Meeting of the Nat'l Acad. of Arb. 16, 18–21 (1983).

482 A.2d 359, 366 (D.C.1984) (same); *see also* RESTATEMENT OF CONTRACTS § 236 (1925). It is also accepted that ambiguous provisions are construed against the drafter of the contract, in this case, Burns. *Id.*; *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, ——, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995). Therefore, in order to uphold the validity of the parties' contract, we interpret the arbitration agreement between Cole and Burns as requiring Burns to pay all arbitrators' fees in connection with the resolution of Cole's claims.

### 4. Judicial Review

■ The final issue in this case concerns the scope of judicial review of arbitral awards in cases of this sort, where an employee is compelled as a condition of employment to arbitrate statutory claims. Cole has argued that the arbitration agreement is unconscionable, because any arbitrator's rulings, even as to the meaning of public law under Title VII, will not be subject to judicial review. Cole is wrong on this point.

Judicial review of arbitration awards covering statutory claims is necessarily focused, but that does not mean that meaningful review is unavailable. The FAA itself recognizes a number of grounds on which arbitration awards may be vacated, including:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence perti-

nent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

The grounds listed in the FAA, however, are not exclusive. Indeed, even in the context of arbitration in collective bargaining—where judicial review of arbitral awards is extremely limited—awards may be set aside if they are contrary to "some explicit public policy" that is "well defined and dominant" and ascertained "by reference to the laws and legal precedents." *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (internal quotation omitted).[19] There is no doubt that the scope of review of arbitration in cases involving mandatory arbitration of statutory claims is *at least* as great as the judicial review available in the context of collective bargaining.

The Supreme Court has also indicated that arbitration awards can be vacated if they are in "manifest disregard of the law." *See First Options of Chicago, Inc. v. Kaplan*, —— U.S. ——, ——, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995) (citing *Wilko v. Swan*, 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953), overruled on other grounds in *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). Although this term has not been defined by the Court, and the

---

**19.** Thus, even in the collective bargaining context, arbitration awards have been vacated when they were inconsistent with public laws like Title VII. *See, e.g., Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1441–42 (3d Cir.1992) (vacating arbitration award granting reinstatement to employee who was fired for sexually harassing a customer's employee, because, in the absence of a finding that the sexual harassment did not occur, public policy against sexual harassment in the workplace and in favor of employer sanctions for sexual harassment by employees, both embodied in Title VII, prohibit reinstatement of worker); *Newsday, Inc. v. Long Island Typographical Union, No. 915*, 915 F.2d 840, 844–45 (2d Cir. 1990) (vacating arbitration award ordering reinstatement of employee found to have committed numerous acts of sexual harassment based on arbitrator's view that incidents did not call for immediate discharge, finding that award violated public policy against sexual harassment embodied in Title VII and other statutes and prevented employer from carrying out legal duty to eliminate sexual harassment in workplace).

circuits have adopted various formulations,[20] we believe that this type of review must be defined by reference to the assumptions underlying the Court's endorsement of arbitration. As discussed above, the strict deference accorded to arbitration decisions in the collective bargaining arena may not be appropriate in statutory cases in which an employee has been forced to resort to arbitration as a condition of employment. Rather, in this statutory context, the "manifest disregard of law" standard must be defined in light of the bases underlying the Court's decisions in *Gilmer*-type cases.

Two assumptions have been central to the Court's decisions in this area. First, the Court has insisted that, " '[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. at 3354) (alteration in original); *see also McMahon*, 482 U.S. at 229–30, 107 S.Ct. at 2338–40. Second, the Court has stated repeatedly that, " 'although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute' at issue." *Gilmer*, 500 U.S. at 32 n. 4, 111 S.Ct. at 1655 n. 4 (quoting *McMahon*, 482 U.S. at 232, 107 S.Ct. at 2340). These twin assumptions regarding the arbitration of statutory claims are valid only if judicial review under the "manifest disregard of the law" standard is sufficiently rigorous to ensure that arbitrators have properly interpreted and applied statutory law.

The value and finality of an employer's arbitration system will not be undermined by focused review of arbitral legal determinations. Most employment discrimination claims are entirely factual in nature and involve well-settled legal principles. *See* Alleyne, 13 HOFSTRA LAB. L.J. at 422 (most arbitration awards in employment cases are based on resolution of factual disputes); Martin H. Malin, *Arbitrating Statutory Employment Claims In the Aftermath of* Gilmer, 40 ST. LOUIS U. L.J. 77, 104 (1996) ("Most employment disputes are fact-based and not likely to raise the kind of legal issues that would call for significant judicial review."). In fact, one study done in the 1980s found that discrimination cases involve factual claims approximately 84 % of the time. *See* Michele Hoyman & Lamont E. Stallworth, *The Arbitration of Discrimination Grievances in the Aftermath of* Gardner- Denver, 39 ARB. J. 49, 53 (Sept.1984). As a result, in the vast majority of cases, judicial review of legal determinations to ensure compliance with public law should have no adverse impact on the arbitration process.[21] Nonetheless, there will be some cases in which novel or difficult legal issues are presented demanding judicial judgment. In such cases, the courts are empowered to review an arbitrator's award to ensure that its resolution of public law issues is correct. Indeed, at oral argument, Burns conceded the courts' authority to engage in such review. Because meaningful judicial review of public law issues is available, Cole's agreement to arbitrate is not unconscionable or otherwise unenforceable.

### IV. CONCLUSION

We acknowledge the concerns that have been raised regarding arbitration's ability to vindicate employees' statutory rights. How-

**20.** *See, e.g., Advest, Inc. v. McCarthy*, 914 F.2d 6, 8–9 (1st Cir.1990) (to set aside award for manifest disregard of law, challenger must show award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995) (award is in manifest disregard of law if "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal

principle."); *Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1267 (7th Cir.1992) (award is in manifest disregard of law if arbitrator deliberately disregards what he or she knows to be the law).

**21.** The Hoyman/Stallworth study of arbitral awards in discrimination cases found that, even in cases where *de novo* review was available under *Gardner–Denver*, only 1.2 % of all discrimination cases were reversed by the courts. *See* Hoyman & Stallworth, 39 ARB. J. at 55.

ever, for all of arbitration's shortcomings, the process, if fairly conducted, is not necessarily inferior to litigation as a mechanism for the resolution of employment disputes. As the Dunlop Commission recognized:

> [L]itigation has become a less-than-ideal method of resolving employees' public law claims. As spelled out in the Fact Finding Report, employees bringing public law claims in court must endure long waiting periods as governing agencies and the overburdened court system struggle to find time to properly investigate and hear the complaint. Moreover, the average profile of employee litigants ... indicates that lower-wage workers may not fare as well as higher-wage professionals in the litigation system; lower-wage workers are less able to afford the time required to pursue a court complaint, and are less likely to receive large monetary relief from juries. Finally, the litigation model of dispute resolution seems to be dominated by "ex-employee" complainants, indicating that the litigation system is less useful to employees who need redress for legitimate complaints, but also wish to remain in their current jobs.

COMMISSION ON THE FUTURE OF WORKER–MANAGEMENT RELATIONS, REPORT AND RECOMMENDATIONS at 30. Arbitration also offers employees a guarantee that there will be a hearing on the merits of their claims; no such guarantee exists in litigation where relatively few employees survive the procedural hurdles necessary to take a case to trial in the federal courts.

As a result, it is perhaps misguided to mourn the Supreme Court's endorsement of the arbitration of complex and important public law claims. Arbitrators, however, must be mindful that the Court's endorsement has been based on the assumption that "competent, conscientious, and impartial arbitrators" will be available to decide these cases. *Mitsubishi Motors*, 473 U.S. at 634, 105 S.Ct. at 3357. Therefore, arbitrators must step up to the challenges presented by the resolution of statutory issues and must be vigilant to protect the important rights embodied in the laws entrusted to their care.

"Greater reliance on private process to protect public rights imposes a professional obligation on arbitrators to handle statutory issues only if they are prepared to fully protect the rights of statutory grievants." Calvin William Sharpe, *Adjusting the Balance Between Public Rights and Private Process:* Gilmer v. Interstate/Johnson Lane Corporation, PROC. OF THE 45TH ANN. MEETING OF THE NAT'L ACAD. OF ARB. 161, 179 (1993). To meet that obligation, arbitrators must educate themselves about the law. *See* Stephen L. Hayford, *The Changing Character of Labor Arbitration,* PROC. OF THE 45TH ANN. MEETING OF THE NAT'L ACAD. OF ARB., 69, 85 (1993) ("[A]rbitrators who accept appointments in cases involving claimed violations of Title VII, the ADA, and other statutes must demonstrate a working knowledge of the basic protections and proscriptions of those statutes as well as the case law underlying them."). They must follow precedent and must adopt an attitude of judicial restraint when entering undefined areas of the law. *See* Stallworth & Malin, PROC. OF THE 46TH ANN. MEETING OF THE NAT'L ACAD. OF ARB. at 120–21. Arbitrators must actively ensure that the record is adequately developed and that procedural fairness is provided. *See* Ira F. Jaffe, *The Arbitration of Statutory Disputes: Procedural and Substantive Considerations,* PROC. OF THE 45TH ANN. MEETING OF THE NAT'L ACAD. OF ARB., 110, 115, 127–28 (1993). And appointing agencies like AAA must be certain that only persons who are able to satisfy these criteria are added to arbitrator-panel lists. For if arbitrators and agencies do not meet these obligations, the courts will have no choice but to intercede.

For the foregoing reasons, we affirm the District Court's order dismissing the complaint and compelling arbitration.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:

The majority's first holding, that the arbitration agreement Cole signed is binding, is easily reached and I readily concur in it. As the majority indicates, both the statutory language and the decisions of "every circuit

to consider this issue squarely" compel the conclusion that the agreement here does not come within the Section 1 exemption to the FAA. Maj. Op. 1471. The majority also acknowledges that the Supreme Court in *Gilmer* "now has made it clear that, as a general rule, statutory claims are fully subject to binding arbitration, at least outside of the context of collective bargaining." Maj. Op. 1478. Finally, the majority observes, as it must, that "all of the factors addressed in *Gilmer* are satisfied here." Maj. Op. 1482.

Yet despite all the signals that the agreement must be enforced, the majority reaches the conclusion that it must only after protracted rumination on "what this case is *not* about," notably arbitration in collective bargaining situations, Maj. Op. 1472–76, and the distinction, which the majority ultimately finds irrelevant here, between an arbitrator and a judge, along with the concerns this distinction has raised for the majority (as well as for the Equal Employment Opportunity Commission and, at least in the past, for the National Labor Relations Board), Maj. Op. 1476–80. I see no reason for this far-ranging digression [1]—unless to distract from the subsequent and only briefly, if confoundingly, explicated holding that the employer must assume all arbitrator expenses. And that is the portion of the majority opinion which I do not join.

By conditioning arbitration on the employer's assumption of arbitrator costs,[2] the majority engages in pure judicial fee shifting which finds no support in the FAA, *Gilmer* or the parties' agreement, not one of which addresses arbitration fee allocation. Yet, relying on this very silence, the majority now declares that the employer must bear the costs, regardless of the outcome or the merits of the parties' positions, because of the majority's own speculation on what the arbitration costs will be and who will be required to pay them—factual matters never presented to the district court or even argued by the parties on appeal.[3] The issues of costs and their allocation were first posed by the panel *sua sponte* during oral argument. I question initially, therefore, whether we should address them at all. *Cf.* Maj. Op. at 1484 n.12 ("Because Cole has not challenged the administrative fees charged by AAA, we do not address whether the AAA's refusal to waive filing and other administrative fees could preclude enforcement of an arbitration agreement."). In any event, the majority has now resolved those issues on the basis of its own research, *see* Maj. Op. 1480 n.8, 1483–84 & n.13, and its construction of the AAA Rules, which were introduced only after argument at the panel's request. Because the district court dismissed the complaint on a bare record consisting of the pleadings and attached exhibits, I would at a minimum remand to afford that court the opportunity to develop an evidentiary record and to make findings of fact regarding the likely costs and their allocation. Nevertheless, if the majority insists on soliciting evidence on its own and construing the AAA Rules in the first

---

1. While I find the majority's lengthy discourses irrelevant and unnecessary, I cannot help but contrast the observation therein that "[a] court is unlikely to rely on a treatise—even ... a widely respected one," Maj. Op. 1477 (quoting Richard H. Block & Elizabeth A. Barasch, *Practical Ramifications of Arbitration of Employment Discrimination Claims, in* Proc. of N.Y.U. 44th Ann. Conf. on Lab. 281, 294 (1991)), with the majority opinion in general and in particular with the portion of Part III.B.1 quoting an article by "Professor Theodore St. Antoine, a preeminent labor law scholar," that "has been widely recognized as an almost gospel statement on the meaning of the *Steelworkers Trilogy.*" *See* Maj. Op. 1475. Of more significance, owing to its impropriety, is the majority's statement that "it is perhaps misguided to mourn the Supreme Court's endorsement of the arbitration of complex and important public law claims." Maj. Op. 1488. It is more

than misguided—it is wrong. We are not in the business of lamenting or celebrating decisions of the United States Supreme Court. We are to follow them. Period.

2. Although the majority purports to require the employer to pay only "arbitrator's fees," it justifies its holding in part by suggesting that these fees merely compound the expense of arbitration which also includes attorney's fees and administrative fees. Yet neither administrative nor attorney's fees should prove more burdensome than in litigation. *See infra* pages 1490–91.

3. The appellant asserted only that (1) Section 1 of the FAA exempts the agreement here from the FAA's general arbitration requirement and (2) the arbitration requirement in the agreement is unconscionable, both of which arguments the majority rejects.

instance, I think it should characterize the rules accurately.

The majority states that the AAA Rules, which it concedes the arbitration agreement "incorporates," [4] are "silent" on allocation of "the arbitrator's fees." *See* Maj. Op. 1485. But the rules are not mute. AAA Rule 35 incorporates by reference the AAA's "Administrative Fee Schedule," which proclaims its allocation policy: "Unless the parties agree otherwise arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award." This statement plainly contemplates the precise circumstance we address here—lack of an express agreement on allocation of arbitrator compensation and administrative fees—and provides a solution—allocation of those expenses by the arbitrator in his award. Thus, the majority, under the rubric of contractual interpretation, modifies the contract's provisions by usurping the arbitrator's authority to allocate "arbitrator compensation" expressly granted under the rules [5] and incorporated into the parties' agreement, *see supra* note 4. The majority thereby ignores the terms to which the parties agreed, choosing instead to rewrite the agreement as the majority would have it read.

The primary justification offered for the majority's contract reformation is to preserve the employee's statutory rights which, the majority asserts, will be lost if he is subject-

ed to all the onerous expenses of arbitration: "[I]f an employee like Cole is required to pay arbitrator's fees ranging from $500 to $1,000 per day *or more,* . . . in addition to administrative and attorney's fees, is it likely that he will be able to pursue his statutory claims? We think not." Maj. Op. 1484 (citation omitted). Yet the majority "assume[s] . . . that employees who would qualify for *in forma pauperis* status in the federal courts will similarly qualify for a waiver of fees under the AAA Rules." Maj. Op. 1484 n.12. Attorney's fees too will presumably be treated in arbitration substantially as they would be in litigation: made contingent upon success and, like administrative fees, assessable against the employer. *See* AAA Rules 32(d), 35. As for the arbitrator expenses (whatever they might actually turn out to be), to the extent if any that the arbitral award does not shift them to the employer, they will not necessarily add to the employee's overall dispute resolution expense. The *Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising out of the Employment Relationship* (endorsed by, among others, the American Arbitration Association, see *supra* n. 4), which calls for arbitrator expenses to be shared to the extent feasible by both employer and employee, *see* ¶ 6, was created with the express goal of "provid[ing] expeditious, accessible, inexpensive and fair private enforcement of statutory employment

---

**4.** The agreement provides that arbitration be conducted "in accordance with the rules of the American Arbitration Association," Deferred App. 12, a provision which plainly allays the majority's concerns about arbitrating statutory claims. The AAA Rules were developed to resolve "[c]onflicts which arise during the course of employment, such as wrongful termination, sexual harassment, and discrimination based on race" (the precise claims raised here) and to enable both employer and employee "to have complaints heard by an impartial person with expertise in the employment field" in "efficient and cost-effective procedures." AAA Rules, *Introduction* at 1–2. To ensure fairness, the AAA drafted the rules "in cooperation with a representative Committee of advisors . . . comprised of fourteen employment management and plaintiff attorneys, retired judges and full-time arbitrators," *id.* at 2, and has "endorse[d] the *Due Process Protocol*, which ensures fairness and equity for the resolution of workplace disputes," see *infra* page 1491, and itself "encourages the use of . . . arbitration of statutory disputes con-

ducted under due process safeguards, *id.* at 3." Further, the AAA, "as a matter of policy, will administer dispute resolution programs which meet the due process standards as outlined in [its] rules and the *Due Process Protocol.*" *Id.* at 3–4.

**5.** The authority to allocate costs generally is inherent in the broad language of Rule 32(c): "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including, but not limited to, any remedy or relief that would have been available to the parties had the matter been heard in court." In addition, the AAA Rules provide for allocation of filing fee costs and for relief to parties who cannot afford administrative costs generally. *See* AAA Rule 35 (providing that "[t]he filing fee shall be advanced by the initiating party or parties, subject to final apportionment by the arbitrator in the award" and that "[t]he AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees.").

disputes," *Protocol, Genesis.* There is no reason to believe that result will not occur here.

The majority also rationalizes its contractual modification as a counter to the employer's commanding position in the employment relationship: "Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment." Maj. Op. at 1484. I would suggest that the appellant's claims will be arbitrated, if at all, because each party agreed that the employer could so elect. In any event, if the majority believes that the arbitration agreement was reached under duress or that it is unconscionable, it should say so straight out and declare it unenforceable, as the appellant requests. On the other hand, if the majority truly believes the agreement is enforceable, as it maintains, it should enforce the agreement as written without judicial reformation.

For the foregoing reasons I dissent from the majority's holding that contractually required arbitration is conditioned on the employer's agreement to pay all arbitrator expenses.