O. Beirne **CHISOLM**, Plaintiff,

v.

**KIDDER, PEABODY ASSET MANAGE-MENT, INC. and Kidder, Peabody & Co., Inc.,** Defendants.

**No. 92 Civ. 0774(CBM).**

United States District Court,
S.D. New York.

May 29, 1997.

Jeffrey L. Liddle, Ethan A. Brecher, Allan S. Bloom, Liddle & Robinson, L.L.P., New York City, for Plaintiff.

## OPINION

MOTLEY, District Judge.

This case involves a largely unexplored legal issue which will undoubtedly be addressed with more frequency in the future: the scope of judicial review of arbitral decisions when an employee has been required as a condition of his employment to submit to arbitration all disputes with his employer, including those involving fundamental statutory rights such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act of 1967, § 2 et seq., as amended, 29 U.S.C. § 621 et seq. ("ADEA"). Despite the fact that plaintiff raises some important concerns regarding the adequacy of arbitration in this area, relevant Second Circuit precedent compels the conclusion that the standard of judicial review of arbitral decisions in cases involving statutory rights is no different from the extremely limited review used in arbitration generally. As a result, the arbitral decision rendered in this case is affirmed.

## BACKGROUND

Plaintiff Beirne Chisolm began his employment with defendant Kidder, Peabody & Co., Inc. ("Kidder, Peabody") in 1957 when he was twenty nine years old. In 1961, plaintiff discontinued his work with defendant to run an investment management business at a company called Clark–Dodge Management, Inc. ("CDM"). CDM was ultimately acquired by defendant Kidder, Peabody in 1974, at which time plaintiff became both president of CDM and a vice-president of defendant Kidder, Peabody. During the years 1989–1990, defendant Kidder, Peabody merged CDM with various other parts of its business and created defendant Kidder, Peabody Asset Management, Inc.

The dispute between the parties arose at this time. In late 1989, George V. Grune, a 35 year old, became the director of defendant Kidder, Peabody Asset Management, Inc. Plaintiff alleges that from his arrival, Grune demonstrated favoritism towards the younger executives. Plaintiff further alleges that Grune failed to give plaintiff a compensation guarantee although he did give it to at least two younger executives.

Plaintiff claims that Grune's discriminatory intentions were further reflected in defendant's Private Clients Analysis (the "Analysis") which was allegedly prepared by Grune's staff at his direction. The Analysis makes reference to the unprofitability of various portfolio managers and suggests that due to such unprofitability, combined with other factors, among which the manager's advancing age is explicitly mentioned, a retirement package is suggested. Though re-

tirement was recommended for plaintiff due to his unprofitability, his advancing age is not mentioned. Plaintiff maintains that his funds were not unprofitable and that this reason was merely pretextual.

In mid-May of 1990, Grune allegedly announced that he was planning substantial changes in the Asset Management Division. Plaintiff claims that these changes, which were effectuated over a several month period, resulted in a significant diminishment of plaintiff's job responsibilities. Specifically, plaintiff claims that Grune removed plaintiff from any responsibility over funds on which he had previously spent over one third of his time and which had assets totaling 4 billion dollars. According to plaintiff, Grune then placed a younger member of the Asset Management Division in charge of them. Grune also allegedly terminated plaintiff's membership on the Investment Policy Committee. Furthermore, though Grune had testified before the arbitration panel that he had intended that plaintiff play an important role with defendants by appointing him head of a division he was going to create, the KPAM Mutual Fund Accounting Division, plaintiff claims that this testimony was a total fabrication intended to deceive the arbitrators and that Grune did not create nor did he ever intend to create such a Division.

Plaintiff alleges that by the beginning of 1991, specific plans were underway to force him to retire. Grune met with plaintiff in February of that year and told him that he would not be receiving a bonus (which had constituted approximately 40–50% of plaintiff's salary in the previous two years) and that plaintiff had not "carried his weight." He also alluded to the possibility that plaintiff work part-time at the meeting.

Plaintiff, who now claims that he was constructively discharged, resigned from his position with defendant a week later. According to plaintiff's allegations, Grune had planned to discharge plaintiff that same day and offer him a severance package along with an opportunity to work on a part-time basis. However, this offer was never made because plaintiff resigned first.

Defendants, on the other hand, deny that any discrimination took place against plain-tiff. Defendants maintain that Grune had decided as part of the 1990 restructuring to assign daily investment managerial responsibility for the $4 billion dollar funds alluded to above to one individual, and he assigned a person who was, along with plaintiff, one of the three people who had been sharing that responsibility. Defendants claim that other than this task, which took less than 20% of plaintiff's time, Grune did not significantly alter plaintiff's job responsibilities.

Defendants further allege that there is ample evidence indicating that plaintiff had begun to search for alternate employment as early as the summer of 1990 and that his resignation was thus not a constructive discharge. Finally defendants claim that even if the facts as plaintiff alleges them were true, they would not be enough to legally constitute a constructive discharge.

## PROCEDURAL HISTORY

Plaintiff filed an action in New York Supreme Court in 1991 alleging four state law claims. In December of that year, defendants moved to stay the action and compel arbitration. The state court held in May of 1991 that the arbitration agreement contained in the Uniform Application for Securities Industry Registration Form (the "U–4 Form") was enforceable. Plaintiff was required by the various securities exchanges to sign the U–4 Form in order to be registered with the exchanges as a securities representative. The court therefore granted defendant's motion and compelled arbitration. *Chisolm v. Kidder, Peabody Asset Management*, No. 33022/91 (N.Y.Sup.Ct.). Plaintiff then filed this action in January of 1992, alleging a violation of the ADEA. Defendants again moved for a stay and an order compelling arbitration on March 3, 1992. By Order and Opinion dated May 28, 1992, this court granted the stay and ordered the case to arbitration, based largely upon the reasoning in the opinion issued weeks earlier in the parallel state action. *Chisolm v. Kidder, Peabody Asset Management, Inc.,* 810 F.Supp. 479, 480–81 (S.D.N.Y.1992).

To decide this matter, an arbitral panel of the National Association of Securities Deal-

ers ("NASD") held 43 hearing sessions and received 157 exhibits. On August 6, 1996, the panel issued an opinion which summarized the contentions of both sides and then read as follows:

> After considering the pleadings, the testimony and the evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows: ... The claims of Claimant O. Beirne Chisolm against Respondents Kidder, Peabody & Co., Inc., Kidder, Peabody Asset Management, Inc., and George V. Grune are dismissed in their entirety.

The panel did not issue findings of fact or conclusions of law, nor did it provide any specific bases for its decision. Plaintiff now moves to have the decision of the panel vacated and retry the issue in this court.

## DISCUSSION

### I. Federal Policy Favoring Arbitrability

■. The purpose of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and to place arbitration agreements on the same footing as other contracts. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991) (citations omitted). The Act requires arbitration agreements to be enforced as a general matter, 9 U.S.C. § 2, provides for district courts to issue stays of arbitration when an issue is referable to arbitration, 9 U.S.C. § 3, and provides narrow grounds for a district court to refuse to enforce arbitral decisions. 9 U.S.C. §§ 10–11. The Supreme Court has held that these provisions manifest "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

Since the mid–1980s, the Supreme Court has made clear that it is not only claims in which contractual rights are asserted which are arbitrable pursuant to the FAA; statutory claims are arbitrable as well. Thus, in the case of *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), the Court held that claims raised under the Sherman Antitrust Act were arbitrable. A similar holding was reached with regard to claims brought under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, in the case of *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Claims arising under the Securities Act of 1933 have also been held to be arbitrable. *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Finally, there is the case of *Gilmer*, which held that claims arising under the ADEA are arbitrable. *Gilmer*, 500 U.S. at 23–36, 111 S.Ct. at 1650–57.

■ The Court has stated that if Congress were to enact a statute which created substantive rights but which also "evinced an intention to preclude a waiver of judicial remedies for [such] statutory rights," then agreements to arbitrate disputes under that statute would be unenforceable. *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. at 3354–55; *accord Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652. However, the above cases make clear that absent a clear indication from Congress that claims asserted under a particular statute are not to be arbitrated, agreements to submit such claims to arbitration will be held enforceable.

In nearly all of the cases brought before the Court in which the arbitrability of a particular statute was at issue, the party resisting arbitration introduced a parade of horribles that it claimed would ensue should agreements to arbitrate claims raised under that statute be enforced. They have argued (1) that arbitration panels will be biased, (2) that claims brought under the statute in question are often brought by persons with little bargaining power relative to those they are suing and that the parties may not therefore have "chosen" arbitration but rather executed a contract of adhesion, (3) that discovery in arbitration is more limited, (4) that the public policies which the statute in question was intended to serve would be thwart-

ed, and (5) that the rights granted to the parties by Congress would not be vindicated. *See, e.g., Gilmer,* 500 U.S. at 26–34, 111 S.Ct. at 1652–57; *Mitsubishi,* 473 U.S. at 624–26, 105 S.Ct. at 3353–54.

The Court has repeatedly dismissed these arguments as resting "on suspicion of arbitration as a method of weakening the protections afforded in the substantive law" that has "fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Rodriguez,* 490 U.S. at 481, 109 S.Ct. at 1920. Inasmuch as arbitral bias is concerned, the court has noted that enforcement of the arbitral award can be refused by a district judge if bias is demonstrated, 9 U.S.C. § 10(b), and that a competent arbitration association should be willing and able "to retain competent, conscientious and impartial arbitrators." *Mitsubishi,* 473 U.S. at 627, 105 S.Ct. at 3354. Concerns regarding the possibility of a contract of adhesion were similarly rejected because not all agreements to arbitrate statutory claims are contracts of adhesion and because courts can refuse to enforce those arbitration agreements that "resulted from the sort of . . . overwhelming economic power that would provide grounds for the revocation of any contract." *id.;* 9 U.S.C. § 2. Unfairness due to limited discovery has also been dismissed by the Court because, "though the procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality and expedition of arbitration." *Gilmer,* 500 U.S. at 31–32, 111 S.Ct. at 1655 (citation omitted).

Most importantly, in response to the arguments by plaintiffs that compelling arbitration of statutory claims thwarts the broad remedial purposes of those claims and denies to the claimants a right given to them by Congress, the Court has stated on numerous occasions that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354; *accord McMahon,* 482 U.S. at 229–30, 107 S.Ct.

at 2339; *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652. Moreover, according to the Court, "so long as the prospective litigant may vindicate his or her statutory cause of action in the arbitral forum, the statute will continue to serve its remedial as well as deterrent function," *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. at 3359; *accord Gilmer,* 500 U.S. at 28, 111 S.Ct. at 1653. Finally, the Court has indicated that though "there is no reason to assume at the outset that arbitrators will not follow the law," judicial review of an arbitral award "is sufficient to ensure that arbitrators comply with the requirements of the statute." *McMahon,* 482 U.S. at 232, 107 S.Ct. at 2340. Having reviewed the law regarding the arbitrability of statutory claims, the court turns now to the review conducted by judges after arbitral decisions have been rendered.

## II. Judicial Review of Arbitral Awards

### A. Review Under Present Law

Judicial review of arbitral awards is extremely limited. Sections 10 and 11 of the FAA itself provide certain narrow grounds for vacating an arbitral award. Under § 10, an award may be vacated if: (1) it was procured by corruption or fraud, (2) there was bias on the part of the arbitrators, (3) the arbitrators were guilty of misconduct for failing to postpone the hearing on good cause shown or for refusing to hear evidence pertinent to the claim, or (4) the arbitrators exceeded their powers. 9 U.S.C. § 10. Under § 11, a court may modify or correct an award where: (1) there was an evident material miscalculation of figures, (2) the arbitrators have awarded on a matter which was not submitted to them, or (3) the award is imperfect in a manner or form not affecting the merits of the controversy. 9 U.S.C. § 11. *See also Carte Blanche (Singapore) v. Carte Blanche (Int.),* 888 F.2d 260, 264–65 (2d Cir. 1989) (discussing §§ 10–11 of the FAA).

There is also a judicially-created doctrine, introduced by the Supreme Court in the case of *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953), *overruled on other grounds, Rodriguez de Quijas v. Shearson/American Express,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), which permits a court to vacate an arbitral award.

According to the Court, an arbitral award does not need to be enforced if it can be shown that the arbitrators "manifestly disregarded the law" in reaching their decision. *Id.; First Options of Chicago v. Kaplan,* 514 U.S. 938, 941, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995).

The Court has been somewhat ambiguous in defining the contours of the manifest disregard doctrine, and the several Courts of Appeal have adopted various formulations.[1] The Second Circuit's most complete formulation appears in the case of *Merrill Lynch, Pierce, Fenner & Smith v. Bobker,* 808 F.2d 930, 933 (1986). In *Bobker,* the plaintiff was an investor who had instituted an arbitration proceeding against a brokerage firm, alleging that the firm had failed to execute a "short sale" of securities as he had requested, and that this failure resulted in his losing $23,000. Defendant argued that it had no obligation to execute this sale and that if it had done so, it would have been in violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–4 promulgated thereunder. After plaintiff was awarded $12,500 by an arbitral panel, defendant appealed, arguing that the arbitrators had manifestly disregarded the law by misconstruing the statute. In affirming the award, the Second Circuit stated the following:

> Although the bounds of [the manifest disregard of the law doctrine] have never been defined, it clearly means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties. Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it.

*Id.* at 933–34.

*Accord Conntech Development Co. v. University of Conn.,* 102 F.3d 677, 687 (2d Cir.1996); *International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 85 (2d Cir.1996); *W.K. Webster & Co. v. American Pres. Lines, Ltd.,* 32 F.3d 665, 669 (2d Cir.1994); *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111–12 (2d Cir.1993); *Carte Blanche (Singapore) Pte. v. Carte Blanche Int'l,* 888 F.2d 260, 264–65 (2d Cir.1989); *Fahnestock & Co., Inc. v. Waltman,* 935 F.2d 512, 515 (2d Cir.1991); *Matter of Arbitration No. AAA13–161–0511085,* 867 F.2d 130, 133 (2d Cir.1989).

In accordance with the Second Circuit's rulings on the subject, this court has repeatedly refused to overturn arbitral awards on the ground of manifest disregard even if the decision reached by the arbitrator is clearly erroneous. In the case of *DiRussa v. Dean Witter Reynolds, Inc.,* 936 F.Supp. 104 (S.D.N.Y.1996), for example, an arbitrator failed to grant attorney's fees to a litigant who had succeeded on a claim raised under

1. *See, e.g., Advest, Inc. v. McCarthy,* 914 F.2d 6, 8–9 (1st Cir.1990) (to set aside award for manifest disregard of the law, party resisting enforcement of award must demonstrate that the award is: "(1) unfounded in reason and fact, (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling, or (3) mistakenly based on a crucial assumption that is concededly a nonfact"); *Merrill Lynch v. Jaros,* 70 F.3d 418, 421 (6th Cir.1995) (holding that the two elements needed to establish manifest disregard are: "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle."); *Remmey v. PaineWebber, Inc.,* 32 F.3d 143 (4th Cir.1994) (manifest disregard is shown when "arbitrators understand and correctly state the law, but proceed to disregard the same") (quoting *San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.,* 293 F.2d 796, 801 (9th Cir.1961)); *Health Services Management Corp. v. Hughes,* 975 F.2d 1253, 1267 (7th Cir.1992) (award is in manifest disregard of the law if the arbitrator deliberately disregards what he or she knows to be the law).

the ADEA. The court affirmed the award despite the fact that "it is difficult to imagine a more well-defined, explicit and clearly applicable provision of governing law than the ADEA's mandate that successful age discrimination claimants ... recover attorney's fees." *Id.* at 106. According to the court, because the entitlement to attorney's fees is not written directly into the statute, the award is not of the type "capable of being instantly and readily perceived" by an arbitrator, and, therefore, the arbitrators did not manifestly disregard the law. *Id.* at 106–07. *See also Matter of Asamera & Tesoro,* 807 F.Supp. 1165, 1168 (S.D.N.Y.1992) ("In so doing, [plaintiff] merely asserts an error in the arbitrators' application of the law ... insufficient to rise to the level of manifest disregard.")

■ Finally, in the words of the Second Circuit, "[i]t is difficult to apply this standard of review when arbitrators give no explanation for their decision.... However, since arbitrators are not required to provide an explanation ..., a reviewing court must still perform the difficult task of evaluating the conduct and conclusions of the arbitrators.... [In such a case], a reviewing court can only infer from the facts of the case whether the arbitrators appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it." *Willemijn Houdstermaatschappij v. Standard Micro.,* 103 F.3d 9, 12–13 (2d Cir. 1997) (citations omitted). *See also Wall Street Assoc. v. Becker Paribas Inc.,* 27 F.3d 845, 849 (2d Cir.1994) ("arbitrators are not required to provide the rationale for their award.... [T]he party challenging the award must show that no proper basis for the award can be inferred from the facts of the case") (citations omitted).

## B. Plaintiff's Argument for the Existence of a Separate Standard

■ It should be obvious from the cases cited above that arbitral awards are vacated only under extremely narrow circumstances. Even plaintiff's counsel concedes that "the odds of overturning this award would be long indeed under the current case law." (Transcript of Oral Argument, p. 3). However, plaintiff urges that this court apply a different manifest disregard standard for claims asserting statutory rights. Plaintiff argues that to apply the Second Circuit's extremely narrow manifest disregard standard to controversies involving statutory rights would run counter to the Supreme Court's dicta in cases like *Mitsubishi, Gilmer,* and *McMahon.* In these cases, the Court made clear that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum" *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354; *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652, and that judicial review "is sufficient to ensure that arbitrators comply with the requirements of the statute" *McMahon,* 482 U.S. at 232, 107 S.Ct. at 2340. If arbitral awards could only be overturned on those extremely rare occasions when an arbitrator, fully aware of the fact that he was expected to apply a clear legal principle, decided to ignore that principle completely, judicial review would plainly not be sufficient to ensure that the requirements of the statute were being followed.

Plaintiff raises some important issues worthy of serious consideration. It is undoubtedly true that arbitration is more prompt and cost effective than traditional litigation and that it can be a far more preferable means of dispute resolution in some circumstances. However, there are certain occasions when the use of arbitration raises greater concerns.

One such occasion is when employees are essentially forced to arbitrate statutory claims against their employer. The increasing number of employer-employee arbitration agreements, drafted essentially by the employer and forced upon the employee,[2] as a

---

2. The court is not suggesting that such agreements in most cases are so egregious that they are unconscionable or that the employer has "overweening bargaining power." As was noted earlier, if this were the case, the agreements would be unenforceable pursuant to 9 U.S.C. § 2, which provides that agreements to arbitrate are enforceable only to the extent that contracts are generally enforceable. However, while employment agreements are usually not unconscion-

condition of his or her employment, has been well documented in the media.[3] *See, e.g.,* L.M. Sixel, *Case Leads Employers to Rethink Arbitration Rules,* HOUSTON CHRON., Jan. 29, 1996. In many cases, the employers impose a number of self-serving arbitration rules designed to limit plaintiff's ability to recover. *Id. See also Cole v. Burns International Security Services,* 105 F.3d 1465, 1997 WL 51684 (D.C.Cir.1997) (invalidating that portion of an arbitration agreement requiring that costs of arbitrator be borne by plaintiff). While such rules may not be so self-serving that they constitute procurement of an award through "corruption, fraud, or undue means" 9 U.S.C. § 10(a), they can nonetheless act as a significant barrier to the ability of litigants to vindicate their statutory rights. Given that the rights at issue are often the right to be free from discrimination in the workplace on the basis of race, sex, and age, such barriers to recovery are quite troubling.

Even in cases where the rules of arbitration are not explicitly biased towards employers, there is a widespread perception that arbitration is a dispute resolution process which is generally more favorable to employers than it is to employees. *See Bill Would Expand Workers' Rights,* THE SACRAMENTO BEE, August 18, 1994 at 11[4].

In addition, commentators have raised serious questions regarding the competence of arbitrators to decide discrimination claims. One commentator has indicated that arbitrators often rely on leading Supreme Court cases of employment discrimination without citing to lower court decisions interpreting these cases, thus applying what they understand the broad principles of a particular doctrine to be without paying attention to how that doctrine has been applied. Richard H. Block & Elizabeth A. Barasch, *Practical Ramifications of Arbitration of Employment Discrimination Claims,* PROC. OF N.Y.U. 44TH ANN. CONF. ON LAB. 281, 294 (1991). Judge Harry T. Edwards has noted that even though 16% of arbitrators have not read any judicial opinions involving Title VII and 40% do not read labor advance sheets to keep abreast of developments in Title VII, half of the arbitrators in each of the former groups nonetheless feels professionally competent to decide legal issues involving employment discrimination. *Arbitration of Employment Discrimination Cases: An Empirical Study,* PROC. OF THE 28TH ANN. MEETING OF THE NAT'L ACAD. OF ARB. 59, 71–72 (1976). Finally, there are other commentators who question the ability of arbitrators in the securities industry to handle discrimination claims, arguing that the commercial and securities-related disputes that the industry's arbitral bodies were created to address are very different from employment discrimination suits and that these bodies are therefore not qualified to deal with disputes of the latter type. Meghan L. Dunphy, *Mandatory Arbitration: Stripping Securities Industry Employees of Their Civil Rights,* 44 CATH. UNIV. L. REV. 1169 (1995); *but see* Theodore O. Rogers, *Employment Discrimination,* 63 FORDHAM L. REV. 1613, 1620 (1995) (indicating the author's belief that NYSE arbitrators are well trained in

able, it would be ludicrous to suggest that an arbitration provision is placed in an employment contract by two parties with equal bargaining power dealing at arm's length.

3. It should be noted that the arbitration agreement in this case was actually not required by plaintiff's employer, but by the New York Stock Exchange as a condition of registration as a securities dealer. However, it raises the same concerns as those raised in arbitration agreements which constitute part of an actual employment contract.

4. However, it should be noted that the speed and efficiency of arbitration could well induce more wronged employees to initiate employment discrimination suits against their employer, thereby making the arbitral process more beneficial to the employee. Robert J. Lewton, *Are Mandatory, Binding Arbitration Requirements a Viable Solution for Employers Seeking to Avoid Litigating Statutory Employment Discrimination Claims?,* 59 ALB. L. REV. 991, 1029 (1996). *See also* Stephen L. Hayford and Michael J. Evers, *The Interaction between the Employment–at–Will Doctrine and Employer–Employee Agreements to Arbitrate Statutory Fair Employment Practices Claims: Difficult Choices for At–Will Employers,* 73 N. CAL. L. REV. 443 (1995) (indicating their belief that the lower costs of arbitration may induce an increasing number of employees who may have been laid off to file meritless discrimination claims and that given the strong presumption in favor of arbitrability, this may result in a required arbitral hearing for every laid-off employee, thereby eroding the employment at will doctrine).

the law and therefore qualified to handle employment discrimination claims). While the relative inexperience of arbitrators may not be a good reason to refuse arbitration, it might indicate the need for more meaningful judicial review. This is especially so when, as is the case here, the arbitrators fail to provide the basis of their decision.

Finally, the notion that there should be increased judicial review of statutory claims such as the one at bar is not one held exclusively by plaintiff. Judge Edwards has written a long and thoughtful opinion in the *Cole* case advocating that the term manifest disregard be interpreted to involve more substantial judicial oversight in claims raised under the ADEA. *Cole,* 105 F.3d at 1485–88, . The Ninth Circuit has also indicated that the remedies and procedural protections in arbitration can vary significantly from those contemplated by the legislature in conferring statutory rights and that therefore arbitration agreements which were not knowingly entered into will not be enforced. *Prudential Insurance Co. v. Lai,* 42 F.3d 1299, 1305 (9th Cir.1994) (holding that because the "U-4 Form", which was required as a condition of acting as a securities broker, contained an arbitration agreement which did not specify what types of disputes would be arbitrated, it could not be enforced against two individuals suing under Title VII for sexual harassment).

Moreover, a number of government agencies have indicated concerns about employer-mandated arbitrations. The EEOC has argued that, although arbitration can be used to speed up and simplify the process of adjudicating claims, "arbitration that is not knowing and voluntary deprives individuals of substantial rights afforded by Congress...." Memorandum of Points and Authorities of the EEOC as Amicus Curiae, *Duffield v. Robertson Stephens & Co.,* No. C-95-0109-EFL at 1 (N.D. Cal. filed Aug. 4, 1995) *quoted in* Pierre Levy, *Gilmer Revisited: The Judicial Erosion of Employee Statutory Rights,* 26 N.M. L. REV. 455, 478 n. 193 (1996). The NLRB has also raised concerns about mandatory arbitration provisions, recently authorizing the filing of unfair labor charges on behalf of an employee who had refused to sign an agreement to settle

disputes with his employer using binding arbitration. Catherine Wilson, *NLRB Contesting Employer Insistence on Mandatory Arbitration Policies,* THE DAILY RECORD, Sept. 6, 1996, at 12. *See also* NLRB General Counsel Report, January to September 1995, Daily Lab. Rep. (BNA) No. 36, at E-6-7 (Feb. 23, 1996) (indicating that if an agreement to arbitrate prevents employees from filing charges with the NLRB, the agency will find the agreement an unfair labor practice). Finally, two commissioners of the SEC have stated their opposition to the mandatory arbitration of statutory claims in the context of the securities industry, prompting the NASD to undergo a review to determine whether it should still require securities brokers to submit all of its employment discrimination disputes to arbitration as a condition of registration with the securities exchanges. Brett D. Fromson, *Bidding to End Mandatory Arbitration of Broker Bias,* THE WASHINGTON POST, May 11, 1997 (Sunday), at F-4, *Id.* at F-1.

## C. One Standard Exists For Manifest Disregard

There are countervailing factors, however, which require the court to decline plaintiff's invitation to create a second standard for manifest disregard when statutory claims are made.

### 1. Relevant Second Circuit Precedent

First of all, the manifest disregard standard has been in existence since 1953. *Bobker,* 808 F.2d at 933. *Bobker,* in which the Second Circuit provided its most comprehensive definition of manifest disregard, was written in 1986, and its holding has been repeatedly affirmed by that court as late as January of this year. *Willemijn Houdstermaatschappij,* 103 F.3d at 13–14. *See also* cases cited in Sec. I.A *supra.* While it is true that the Supreme Court has indicated that rights are not surrendered when a party agrees to arbitrate and that judicial review, though limited, is sufficient to ensure that arbitrators comply with the law, *Gilmer,* 500 U.S. at 28, 111 S.Ct. at 1653; *McMahon,* 482 U.S. at 232, 107 S.Ct. at 2340; *Mitsubishi,* 473 U.S. at 637, 105 S.Ct. at 3359, there is

absolutely nothing in any of these Supreme Court cases or in any Second Circuit precedents which indicates that the scope of review for statutory claims is any different from any other arbitrated claims. An argument can be made that the Circuit needs to create an enhanced standard for employment discrimination claims for the reasons provided in Sec. II.B *supra*. However, such a radical reassessment of the manifest disregard standard cannot be instituted by this court.

## 2. The Scope of Enhanced Judicial Review

Moreover, plaintiff's call for a different definition of manifest disregard to be applied to all statutory claims seems unduly broad. As was mentioned repeatedly above, plaintiff's argument is essentially premised on dicta in three Supreme Court cases which involve a variety of different statutory claims varying from the Sherman Antitrust Act to the ADEA. Thus, in order for plaintiff's argument to be consistent, he is compelled to maintain that the arbitration of all claims that arise under Federal statutes could be problematic and that, therefore, enhanced judicial review is warranted in all such cases. The court is not persuaded that the realm of cases which should be subjected to enhanced review should be so expansive. For example, a large company which holds a patent in a particular product could enter into a licensing agreement with another company requiring the latter to pay royalties for selling any items which use the patented product. It would not be unusual for the agreement to provide that disputes over the scope of the patent and whether it extended to a particular product be submitted to arbitration. *See, e.g., Willemijn Houdstermaatschappij*, 103 F.3d at 11 (describing such an arrangement). It would be difficult to argue that such a case, which clearly involves the adjudication of a statutory right, requires significant judicial oversight. In fact, judicial oversight could well damage the integrity of the arbitral proceeding, as parties would be less likely to enter into beneficial agreements providing for speedy dispute resolution through arbitration when they may be forced to reargue the entire matter in court. While one could contend that it is not statutory claims generally which require a heightened standard of review but rather only employment discrimination claims, plaintiff wisely does not make this argument in light of the fact that there is nothing in the case law which could possibly support such a conclusion.

## 3. The Factual Nature of this Dispute

Though one may be concerned about the ability of arbitrators to apply statutory law in complex cases, this case did not involve very many complex issues at all and is, therefore, probably not the appropriate vehicle in which to effect a major change in the law regarding the judicial enforcement of arbitral awards. In fact, as will be seen in Sec. III *infra*, the case involved a rather simple application of the framework developed by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 800–07, 93 S.Ct. 1817, 1823–27, 36 L.Ed.2d 668 (1973), and there does not seem to be any large legal disputes between the parties regarding the applicable law. Thus, the likelihood that the arbitrators ignored these factual disputes and instead manifestly disregarded the legal principles that were mutually agreed upon by the parties is small indeed. While it would have no doubt been better for the arbitrators to have provided a written opinion, it could be fairly presumed that in this case the arbitrators applied the proper law and simply found the facts differently than plaintiff would like. Obviously, even if there were extensive judicial review, courts would still have to defer to an arbitral panel's findings of fact since it is the panel, after all, which actually hears the case. Thus, the proper scope of review is of little moment in this case in light of the intense factual nature of this dispute.

## III. Review of Arbitral Decision

Having determined that the standard for judicial review is limited to those grounds listed in §§ 10–11 of the FAA as well as the narrow manifest disregard ground defined in *Bobker*, the court now undertakes a review of the decision of the arbitral panel to determine whether or not it should be vacated. Since plaintiff does not argue that any of the grounds listed in the FAA are applicable, the

228

court focusses on whether, in rendering their decision, the arbitrators "manifestly disregarded" the law.

## A. The Standard for Employment Discrimination

In order to establish a prima facie case of discriminatory termination of employment under Title VII, a plaintiff must prove four elements: (1) that he belonged to a particular racial group, (2) that he was qualified for his position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his race. *McDonnell Douglas Corp.* 411 U.S. at 802, 93 S.Ct. at 1824. If the plaintiff is successful in establishing these elements, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the discharge. *Id.* at 802–03, 93 S.Ct. at 1824. It is important to note, however, that it is only the burden of production which shifts to the employer, not the ultimate burden of persuasion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). That is, the employer must come forward with nondiscriminatory reasons for the discharge, but the plaintiff must prove that those proffered reasons are pretextual.

The Second Circuit has held that the *McDonnell/St. Mary's* framework is applicable in discrimination claims under the ADEA as well. *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 359 (2d Cir.1993) (reciting the four *McDonnell* elements in the context of an age discrimination claim); *Fisher v. Vassar College,* 70 F.3d 1420, 1450–51 (2d Cir.1995) ("ADEA claims are subject to the same burden-shifting applicable to Title VII claims, as outlined in *McDonnell Douglas* and *St. Mary's.*") [5]

## B. Basis for Arbitral Decision

In this case, defendants do not dispute that plaintiff has satisfied the first two elements;

he is a member of a protected age group and he was qualified for his position. However, defendants claim that he was not discharged, and that even if he was, defendants have shown legitimate, nondiscriminatory reasons for the discharge.

The Second Circuit has noted, "[a] constructive discharge ... occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into voluntary resignation.... [A] constructive discharge cannot be proved merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993) (citations omitted). Thus, for example, if an employee's performance is criticized in ethnically degrading, lewd and obscene terms, his complaints to the vice president are met with recommendations by the latter that he resign, and he is then put on 90 day suspension and told that he will be discharged as soon as the 90 day period ends, a constructive eviction has been established. *Lopez v. S.B. Thomas,* 831 F.2d 1184 (2d Cir.1987). On the other hand, a nursing home administrator who is planning her retirement and who is told by her employer to concentrate on dealings with government regulatory matters, thereby transferring to her successor responsibility for supervision of day-to-day operations, has not been constructively discharged. *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2d Cir.1983).

There is ample basis from which to conclude that in this case plaintiff was not constructively discharged. First of all, there was evidence that plaintiff had begun investigating the possibility of alternative employment as early as the summer of 1990, more than six months before he resigned. Secondly, defendants have put forward evidence indicating that there was no substantial change in plaintiff's job responsibilities other

5. Obviously, the elements to be proven are slightly reworded in age, as opposed to race, discrimination claims. Thus, the first element that must be proven under the ADEA is that the plaintiff is a member of a protected *age* group (defined as a person over 40 but under 70). *Fisher,* 70 F.3d at 1449. The fourth element is also reworded; the plaintiff must prove that the termination gave rise to an inference of discrimination on the basis of *age.*

than removing him from shared supervision of the 4 billion dollar funds, which, according to defendants, occupies less than 20% of his time. Finally, a reasonable arbitrator could conclude that while not giving plaintiff a bonus in 1990 was indeed a substantial cut in pay, it did not make working conditions "intolerable."

Furthermore, even if it were to be argued that plaintiff was constructively discharged, there is also evidence from which the arbitrators could have concluded that defendants had legitimate, nondiscriminatory reasons for doing so. According to defendants, the change in plaintiff's responsibilities arose from a reorganization of the entire Division and was done for reasons of increased efficiency. In addition, defendant insists that plaintiff was not "carrying his weight" and has submitted evidence to the effect that the portfolios plaintiff was managing were unprofitable. Though plaintiff disputes this evidence, it is not the function of this court to reweigh the evidence, but only to determine whether, in reaching their decision, the arbitrators manifestly disregarded the law. It is clear from the foregoing that plaintiff cannot show such manifest disregard.

## CONCLUSION

For the reasons provided above, the motion to confirm the arbitral award is granted.